CLOSE *v.* GLENWOOD CEMETERY.

BORCHERLING *v.* GLENWOOD CEMETERY.

1. A cemetery company was incorporated in 1854 by an act of Congress which authorized it to purchase and hold ninety acres of land in the District of Columbia, and to receive gifts and bequests for the purpose of ornamenting and improving the cemetery; enacted that its affairs should be conducted by a president and three other managers, to be elected annually by the votes of the proprietors, and to have power to lay out and ornament the grounds, to sell or dispose of burial lots, and to make by-laws for the conduct of its affairs and the government of lot-holders and visitors; fixed the amount of the capital stock, to be divided among the proprietors according to their respective interests; and provided that the land dedicated to the purposes of a cemetery should not be subject to taxation of any kind, and

no highways should be opened through it, and that it should be lawful for Congress thereafter to alter, amend, modify or repeal the act. Presently afterwards thirty of the ninety acres were laid out as a cemetery, the cemetery was dedicated by public religious services, and a pamphlet was published, containing a copy of the charter, a list of the officers, an account of the proceedings at the dedication, describing the cemetery as " altogether comprising ninety acres, thirty of which are now fully prepared for interments," and the by-laws of the corporation, which declared that all lots should be held in pursuance of the charter. No stock was ever issued. But the owner of the whole tract, named in the charter as one of the original associates, and in the list published in the pamphlet as the president and a manager of the corporation, knowing all the above facts, and never objecting to the appropriation of the property as appearing thereby, for more than twenty years managed the cemetery, sold about two thousand burial lots, and gave to each purchaser a copy of the pamphlet, and a deed of the lot, signed by himself as president, bearing the seal of the corporation, and having the by-laws printed thereon. In 1877 Congress passed an act, amending the charter of the corporation, providing that its property and affairs should be managed, so as to secure the equitable rights of all persons having any vested interest in the cemetery, by a board of five trustees to be elected annually, three by the proprietors of lots owned in good faith upon which a burial had been made, and two by the original proprietors; and that of the gross receipts arising from the future sale of lots one-fourth should be annually paid by the trustees to the original proprietors and the rest be devoted to the improvement and maintenance of the cemetery. *Held*, that the act of 1877 was a constitutional exercise of the power of amendment reserved in the act of 1854; that the owner of the land was estopped to deny the existence of the corporation, the setting apart of the whole ninety acres as a cemetery, and the right of the lotholders to elect a majority of the trustees; and that he was in equity bound to convey the whole tract to the corporation in fee, and to account to the corporation for three-fourths of the sums received by him from sales of lots since the act of 1877; and the corporation to pay him one-fourth of the gross receipts from future sales of lots.

2. Pending a bill in equity against the owner of land to compel a conveyance of the title, subject to certain rights of his in the rents and profits, a receiver appointed in another suit against him, and to whom he had by order of court in that suit assigned his interest in the land, applied to be and was made a defendant, and answered, and also filed a cross-bill against both the original parties, which was afterwards ordered to be stricken from the files, with leave for him to apply for leave to file a cross-bill; but he never applied for such leave. The case was heard upon pleadings and proofs, and a final decree entered ordering the original defendant to convey to the complainant, and the complainant to account to him or his assigns for part of the rents and profits, and that this decree be without prejudice to the rights of the receiver. *Held*, that the receiver was not aggrieved.

APPEALS from the Supreme Court of the District of Columbia.

The facts are stated in the opinion of the court.

*Mr. J. Hubley Ashton* and *Mr. Nathaniel Wilson* for Close.

*Mr. Cortlandt Parker* and *Mr. Walter D. Davidge* for Borcherling.

*Mr. Thomas W. Bartley*, *Mr. William F. Mattingly*, and *Mr. Jesup Miller* for the appellee.

MR. JUSTICE GRAY delivered the opinion of the court.

This is a bill in equity, filed on the 25th of October, 1877, by the Glenwood Cemetery, claiming to be a corporation established by act of Congress, against Joseph B. Close, William S. Humphreys, Randolph S. Evans and George Clendenin, praying for a conveyance of the legal title in a tract of land containing ninety acres, situated in the District of Columbia, known as the Glenwood Cemetery; and for an account. The bill was afterwards dismissed by consent as against Humphreys and Evans. The material facts, as shown by the proofs, are as follows : —

In June, 1852, Humphreys, for the sum of $9,000, bought of Junius J. Boyle the tract of land in controversy, and took from him a deed of it, and immediately set about preparing it for use as a cemetery. He enclosed with a high fence, and laid out with drives and walks, and improved and embellished, thirty acres of it, leaving the other sixty acres in their original unimproved condition; and in March, 1853, put Clendenin in charge as superintendent. Humphreys conveyed to Close an undivided half of the premises in April, 1853, and the whole tract in June, 1854. The two deeds were absolute in form, but were, in fact, intended as security; the first for the repayment of $20,000, advanced to Humphreys by Close, for the purpose, as Close knew, of converting the estate into a cemetery; and the second for the repayment of other advances to the amount of $7,000, already made to him by Close, for the same purpose, and of subsequent like advances, of the amount of which there is no evidence but Close's own vague and unsatisfactory testimony, unsupported by books or vouchers; and the parties agreed in writing that if Humphreys should meet his obligations, he should have back one-half of the land. Humphreys thenceforward managed the property, acting for himself and Close, through Clendenin as superintendent, until September,

1859, when, having failed to meet his engagements, he relinquished all his interest in the property to Close, and Close became sole owner, and assumed control of the property, retaining Clendenin as his superintendent to manage the cemetery.

On the 27th of July, 1854, Congress passed an act entitled " An Act to incorporate the proprietors of Glenwood Cemetery," by which twelve persons named, eight of them residents of the District of Columbia, and the other four being Close and William Phelps, (since deceased,) residents of New Jersey, and Humphreys and Evans, residing in New York, were created a corporation by the name of " The Proprietors of Glenwood Cemetery in the District of Columbia," and were empowered "to purchase and hold not exceeding one hundred acres of land in the District of Columbia, north of the limits of the City of Washington ; to sell and dispose of such parts of said land as may not be wanted for the purpose of a cemetery, provided that at least thirty contiguous acres shall be forever appropriated and set apart as a cemetery ; with authority to said corporation to receive gifts and bequests for the purpose of ornamenting and improving said cemetery ; " and it was enacted that the affairs of the corporation should be conducted by a president and three managers, to be " elected annually by a majority of the votes of the proprietors," and " each proprietor entitled to one vote for each share held by him," and that until the first election the four last-named persons should be managers ; that the president and managers should have power, among other things, " to lay out and ornament the grounds," " to lay out and sell or dispose of burial lots," and " to make such by-laws, rules and regulations as they may deem proper for conducting the affairs of the corporation, for the government of lot-holders and visitors to the cemetery, and for the transfer of stock and the evidence thereof ; " that " the capital stock of said company shall be represented by two thousand shares of fifty dollars each, divided among the proprietors according to their respective interests, and transferable in such manner as the by-laws may direct ; " that " no streets, lanes, alleys, roads, or canals of any sort shall be opened through the property of said corporation, exclusively used and appropriated to the purpose of a cemetery ; provided, that nothing herein

contained shall authorize said corporation to obstruct any public road or street or lane or alley now actually opened and used as such;" that any person wilfully destroying, injuring or removing any tomb, monument, gravestone, fence, railing, tree or plant within the limits of the cemetery, should be considered guilty of a misdemeanor; that "each of the stockholders in the said company shall be held liable in his or her individual capacity for all the debts and liabilities of the said company, however contracted or incurred;" that "burial lots in said cemetery shall not be subject to the debts of the lot-holders thereof, and the land of the company dedicated to the purposes of a cemetery shall not be subject to taxation of any kind;" that a certificate, under seal of the corporation, of the ownership of any lot, should have the same effect as a conveyance of real estate; and that "it may be lawful for Congress hereafter to alter, amend, modify or repeal the foregoing act." 10 Stat. 789.

On the 2d of August, 1854, the ceremony of dedicating the cemetery by appropriate religious services and addresses was performed on the spot in the presence of a number of people. Immediately afterwards a pamphlet was published and generally circulated, containing a copy of the charter, a list of the officers, including Close, Phelps, Humphreys and Evans, managers, Close, president, Humphreys, treasurer, and Clendenin, superintendent; a full account of the proceedings at the dedication, in which the property was spoken of as set apart and consecrated for the burial of the dead, and as "altogether comprising ninety acres, thirty of which are now fully prepared for interments;" and the by-laws of the cemetery, of which the first was, "All lots shall be held in pursuance of 'An Act to incorporate the Proprietors of Glenwood Cemetery,' approved July 27, 1854, and shall be used for the purposes of sepulture alone."

Close soon after received a copy of this pamphlet from Humphreys, and from that time to the filing of the bill never objected to the appropriation of the property in the manner appearing thereby. In the course of the next twenty years, about two thousand lots were sold, and each purchaser was given a copy of the pamphlet, and a certificate or deed of his

lot, signed by Close as president, bearing the seal of the com-
pany, and having the by-laws printed thereon. The gross
receipts from the time of the opening of the cemetery to 1876
were $160,000. No stock was ever issued as provided in the
charter.

No taxes were ever paid on any part of the ninety acres.
At different times from 1871 to 1876, taxes were assessed, or
proposed to be assessed, by the municipal authorities, upon the
sixty acres which had not been improved. But Close and Clen-
denin, by representing to the assessors and collector that the
whole tract had been dedicated to burial purposes in accord-
ance with the charter, and by exhibiting to them the charter
and the pamphlet containing the account of the dedication,
induced them to recognize the exemption of the whole tract
from taxation.

On the 28th of February, 1877, Congress passed an act,
amending the act of the 27th of July, 1854; changing the
name of the corporation to " The Glenwood Cemetery; " pro-
viding that its property and affairs should be under the control
of a board of five trustees, any three of whom should be a quo-
rum, to be elected annually, " three by the proprietors of lots
in said cemetery " (each to be " entitled to one vote for each
lot owned by him in good faith, upon which a burial has been
made " ) " and two by the original proprietors," and to have
authority to fill temporary vacancies in the board; that these
trustees should so conduct the affairs of the cemetery " as to
secure the equitable rights of each and every person having in
any way any vested interest in the said cemetery; and the
cemetery shall be amenable and subject to the jurisdiction of
the equity courts of the District of Columbia for any disregard
of the rights or interests of any person whatsoever; " that " the
words ' the proprietors,' where they occur in the original act of
incorporation hereby amended, shall be interpreted and con-
strued to mean and shall signify the proprietors of lots in said
cemetery, and which is hereby now declared by this amend-
ment to be the true intent and meaning of said words; " and
that, of the gross receipts arising " from the sale of lots here-
after sold of the ground now dedicated to burial purposes," one-
fourth should be annually paid by the trustees to the original

proprietors, and the rest be devoted to the improvement and maintenance of the cemetery.   19 Stat. 266.

Pursuant to this act, the owners of lots chose three trustees, who, on the refusal of Close to recognize the corporation as existing, or to appoint two other trustees, filled up the vacancies in the board, and, on the refusal of Close, and of Clendenin as his agent, to deliver up possession to them, filed this bill to compel a conveyance of the legal title and a delivery, of possession of the whole tract, and an account of the proceeds of any lots sold since the organization under the act of 1877.

The defences set up by Close and Clendenin, in their answers and at the argument, are that there never was any acceptance of the act of 1854, or formal organization of the corporation under it, but the property remained the private property of Close, except such lots as had been sold, for which he was ready to give a legal title to the holders; that the act of 1877 was unconstitutional and void, as depriving him of his property without adequate compensation; and that no part of the sixty acres not enclosed was ever dedicated to the purposes of a cemetery in such a way as to interfere with his absolute control over it.

After Close and Clendenin had put in their answers, Charles Borcherling filed a petition to be admitted as a defendant to the bill, alleging that he had been appointed receiver under a decree for alimony rendered in a suit for divorce brought against Close by his wife in the Court of Chancery of New Jersey, and that, in obedience to an order of that court, Close had executed to him as such receiver an assignment of all his personal estate, the rents and profits of his real estate, and "especially the capital stock of the Glenwood Cemetery in Washington in the District of Columbia, and all profits, dividends or other moneys to me coming therefrom, or from any office thereof." This petition of Borcherling was granted, and he filed an answer to the original bill, setting up these facts. He also filed a cross-bill, praying that Close convey the title in the cemetery to the corporation, and that the corporation issue and deliver to Borcherling as receiver as aforesaid stock to the amount of one hundred thousand dollars.   On motion of Close and Clendenin, the court afterwards ordered the cross-bill of

Borcherling to be stricken from the files, with leave to him to apply for leave to file a cross-bill. He never applied for such leave. But the corporation filed a general replication to the answers of Close, Clendenin and Borcherling, proofs were taken, and the case was heard and decided upon the merits.

By the final decree of the court below, it was adjudged that Close convey the whole tract of ninety acres to the plaintiff corporation in fee-simple ; that Close and Clendenin deliver to the plaintiff all books, plans, records and personal property, belonging to or used in connection with its business, and be perpetually enjoined from interfering with or obstructing the plaintiff in the possession and management of the cemetery ; and the court being further of opinion that Close was entitled to be compensated for the transfer of his title in the land as the original proprietor thereof, and that the provision made for this object by the act of Congress of 1877 was an equitable adjustment of the rights of Close, and a reasonable compensation for his title and interest in the property, both in amount and in mode of payment, regard being had to the needs of the cemetery, it was further adjudged that the plaintiff annually hereafter account for and pay to him or his assigns one-fourth of the gross receipts from sales to be made of lots in the cemetery ; and that an account be taken of his receipts from the cemetery since the act of 1877 took effect, and that he be charged in favor of the plaintiff with all sums, over and above one-fourth of the gross receipts from sales of lots, which had been applied to his own use and not properly disbursed on account of the cemetery, and that he pay the costs of suit ; and that this decree be without prejudice to the claims of Borcherling as receiver as aforesaid.

From that decree appeals have been taken and argued by Close and Clendenin and by Borcherling.

The appeal of Borcherling may be briefly disposed of. The order striking his cross-bill from the files reserved leave to him to apply to the court for leave to file a cross-bill. He never made any such application, but, after replication filed to the answers of himself and of the other defendant, suffered proofs to be taken upon the issues so made up, and the case to proceed

to a final decree ; and the final decree is expressed to be made without prejudice to his rights as receiver.  Under these circumstances, there is nothing in the proceedings of the court below prejudicial to those rights, or which entitles him to a reversal of the final decree and to a reopening of the whole case.

Upon the merits of the case, as presented by the appeal of Close and Clendenin, it will be convenient to consider first the question whether, assuming that the charter granted by Congress in 1854 must be held to have been duly accepted by the corporation, and the corporation to have been legally organized under it, the act of 1877 is within the power of alteration, amendment and repeal, reserved to Congress in the original charter.

The terms of that charter show that it was not intended to create a mere land company, for the exclusive benefit of the original associates and their successors holding shares in the stock of the corporation ; but that the ultimate and principal object was to establish and permanently maintain a cemetery for the burial of the dead, which, if not a strictly charitable use, is in some aspects a pious and public use, and was evidently so regarded by Congress.  If the corporation were to be exclusively a private business corporation, created for the sole benefit of the original associates and their successors as holders of shares, Congress would hardly have inserted in the charter the provision authorizing the corporation to receive gifts and bequests for the purpose of ornamenting and improving the cemetery, or the provisions exempting the property from all taxation, and prohibiting the future laying out of any public ways through it.

At first, indeed, the whole immediate benefit derived from the property would be that resulting to the shareholders from the sale of lots, by way of dividend out of so much of the moneys received as might not be needed to be expended or reserved for the laying out, ornamenting and maintenance of the cemetery.  But as fast as lots were sold, the property and interest of those purchasing and holding the land for its ultimate use of the permanent burial of the dead would increase, and the interest of the original associates would diminish.  The

profits to be derived from the sale of the land would cease, as to each parcel, as soon as it was sold for a burial lot. When the lots were all sold, the pecuniary interest of the associates or shareholders would disappear; but the duty to keep up the cemetery would remain, and the owners of lots would be the only persons having a peculiar interest in keeping it up. The corporation, in short, was established to secure and maintain, not merely the right of sale, but the right of burial, and was the representative, not only of the original proprietors of the land, but also of the subsequent purchasers of lots therein.

At the beginning, before any lots were sold, the owners of shares, divided among the proprietors according to their respective interests, would necessarily be the only persons concerned, or who could elect the officers of the corporation and managers of the cemetery. But with the gradual change of interest, resulting from the sale of lots, it was in full accord with the provisions of the charter, and best tended to carry out the main purpose of permanently maintaining a cemetery for the burial of the dead, that the holders of lots should take part in the election and so have a voice in the management.

After the cemetery had been laid out, improved and used for the burial of the dead for more than twenty years, and two thousand burial lots had been sold, it was a reasonable exercise of the reserved power of Congress to authorize the owners in good faith of lots upon which burials had been made, to elect a majority of the trustees, in whom should be vested the control and management of the cemetery, with a due regard to the equitable rights of all persons having any vested interest therein; and to provide that a portion only of the receipts arising from the future sale of lots should be paid to the original proprietors, and the rest be devoted to the improvement and maintenance of the cemetery. Every legislative act is to be presumed to be a constitutional exercise of legislative power until the contrary is clearly established; and there is nothing in the record before us to show that the proportion of one-fourth of the gross receipts from future sales of lots, which is fixed by the act of Congress of 1877 and by the decree of the court below, as a compensation for the title and interest of the original proprietors and associates, is not a reasonable one.

It follows that the act of Congress of 1877 must be deemed constitutional and valid, within the principle affirmed by this court in the case of *The Holyoke Dam*, that a power reserved to the legislature to alter, amend or repeal a charter authorizes it to make any alteration or amendment of a charter granted subject to it, which will not defeat or substantially impair the object of the grant, or any rights vested under it, and which the legislature may deem necessary to secure either that object or any public right. *Commissioners on Inland Fisheries* v. *Holyoke Water Power Co.*, 104 Mass. 446, 451; *Holyoke Company* v. *Lyman*, 15 Wall. 500, 522. In the exercise of such a power by the United States, as was observed by the Chief Justice in delivering the opinion of the court in the *Sinking Fund Cases*, "it is not only their right, but their duty, as sovereign, to see to it that the current stockholders do not, in the administration of the affairs of the corporation, appropriate to their own use that which in equity belongs to others." 99 U. S. 700, 725.

The question then recurs whether, as against Close, the corporation must be held to have been duly organized under the act of Congress of 1854.

Upon this question the facts are these: Close knew that the act of incorporation had been granted by Congress, in which he was named as one of the original associates; that the cemetery had been dedicated and set apart by public religious ceremonies for the burial of the dead; that a pamphlet had been published, containing a full account of those ceremonies, the names of a full board of officers, including himself as president and one of the managers, and Clendenin as superintendent, and a code of by-laws, by the very first of which all lots were to be held in pursuance of the act of incorporation and to be used for the purposes of sepulture alone. With full knowledge of these facts, Close, for more than twenty years, exercised through Clendenin the sole management of the cemetery, and issued deeds and certificates of burial lots to the number of more than two thousand, bearing the corporate seal, and his own signature as president of the corporation, and having the by-laws printed on them. Being himself the owner of the whole land, he dealt with it in all respects as if it belonged to

the corporation, and so represented it to the purchasers of lots. As no other person owned any part of the land or was entitled to a share in the corporation, the fact that no stock has been issued or divided is immaterial.

One who deals with a corporation as existing in fact is estopped to deny as against the corporation that it has been legally organized. And in a court of equity, at least, the owner of land, who stands by and sees it conveyed as belonging to another, cannot afterwards set up his own title against the grantee. The present case is yet stronger. Close did not merely deal with the corporation, and permit the corporation to convey parts of his land to purchasers of lots. But he himself assumed to act as the corporation, and himself made the conveyance, and the accompanying representations, to every purchaser.

By his acts he represented to the purchasers of lots that the cemetery had been created and the land was owned by the corporation under the charter of 1854, and, as a necessary consequence, that the corporation, and all rights derived from it, were subject to the provisions of that charter, including the reservation to Congress of the power of alteration, amendment or repeal. It is upon these representations that the purchasers of lots have acquired their title and have parted with their money ; and the corporation, whose existence he, at least, cannot deny, has the right and the duty, as the representative and in behalf of all the purchasers of lots, to enforce against him the obligation which he has thereby assumed. He holds the fee of the cemetery in trust for the corporation, and is entitled to nothing, as against the corporation and those whom it represents, but such compensation for his interest as original proprietor or stockholder, as is consistent with the state of things which he has represented to exist.

It is argued by the learned counsel for the appellants that the estoppel and the obligation of Close cannot extend beyond the thirty acres which had been actually laid out. This argument appears to us to be fully met and answered in the able and thorough opinion of the court below, delivered by Mr. Justice Cox, who says: " It was held out to the lot-holders, not only that the ground immediately available for burial

should remain set apart for that object, but that the cemetery should be for ever under the protection of a perpetual corporation, charged with the duty of laying out and ornamenting the grounds, capable of receiving gifts and bequests, and empowered to make by-laws for the regulation of the affairs of the corporation; and the whole property was described as dedicated to the purposes of the cemetery, not necessarily that the whole should be laid out into lots, but that it should all belong to the institution and be available for its general objects. This was not to be a mere graveyard in which each lot-holder acquired a piece of ground in which to bury his dead, and at the same time become chargeable with the sole care of his particular lot; but the lot-holders themselves became subject to by-laws and regulations having reference to the institution as an entirety, and the perpetual preservation of the cemetery as an ornamental and convenient place for interment and for resort by the relatives of the dead." *Glenwood Cemetery* v. *Close*, 7 Washington Law Reporter, 214, 218.

*Decree affirmed.*