## BEREA COLLEGE *v.* COMMONWEALTH OF KENTUCKY.

ERROR TO THE COURT OF APPEALS OF THE STATE OF KENTUCKY.

No. 12. Argued April 10, 13, 1908.—Decided November 9, 1908.

This court will not disturb the judgment of a state court resting on Federal and non-Federal grounds if the latter are sufficient to sustain the decision.

The state court determines the extent and limitations of powers conferred by the State on its corporations.

A corporation is not entitled to all the immunities to which individuals are entitled, and a State may withhold from its corporations privileges and powers of which it cannot constitutionally deprive individuals.

A state statute limiting the powers of corporations and individuals may be constitutional as to the former although unconstitutional as to the latter; and, if separable, it will not be held unconstitutional at the instance of a corporation unless it clearly appears that the legislature would not have enacted it as to corporations separately.

The same rule that permits separable sections of a statute to be declared unconstitutional without rendering the entire statute void, applies to separable provisions of a section of a statute.

The prohibition in § 1 of the Kentucky statute of 1904, against persons and corporations maintaining schools for both white persons and negroes is separable, and even if an unconstitutional restraint as to individuals it is not unconstitutional as to corporations, it being within the power of the State to determine the powers conferred upon its corporations.

While the reserved power to alter or amend charters is subject to reasonable limitations, it includes any alteration or amendment which does not defeat or substantially impair the object of the grant or vested rights.

A general statute which in effect alters or amends a charter is to be construed as an amendment thereof even if not in terms so designated.

A state statute which permits education of both white persons and negroes by the same corporation in different localities, although prohibiting their attendance in the same place, does not defeat the object of a grant to maintain a college for all persons, and is not vio-

lative of the contract clause of the Federal Constitution, the state law having reserved the right to repeal, alter and amend charters.

123 Kentucky, 209, affirmed.

ON October 8, 1904, the grand jury of Madison County, Kentucky, presented in the Circuit Court of that county an indictment, charging:

"The said Berea College, being a corporation duly incorporated under the laws of the State of Kentucky, and owning, maintaining and operating a college, school and institution of learning, known as 'Berea College,' located in the town of Berea, Madison County, Kentucky, did unlawfully and willfully permit and receive both the white and negro races as pupils for instruction in said college, school and institution of learning."

This indictment was found under an act of March 22, 1904 (acts Kentucky, 1904, chap. 85, p. 181), whose first section reads:

"SEC. 1. That it shall be unlawful for any person, corporation or association of persons to maintain or operate any college, school or institution where persons of the white and negro races are both received as pupils for instruction, and any person or corporation who shall operate or maintain any such college, school or institution shall be fined $1,000, and any person or corporation who may be convicted of violating the provisions of this act shall be fined $100 for each day they may operate said school, college or institution after such conviction."

On a trial the defendant was found guilty and sentenced to pay a fine of one thousand dollars. This judgment was on June 12, 1906, affirmed by the Court of Appeals of the State (123 Kentucky, 209), and from that court brought here on writ of error.

*Mr. John G. Carlisle* and *Mr. Guy Ward Mallon* for plaintiff in error:

A legislative enactment depriving a person of the right to pursue his usual occupation or depriving a person of the right to attend a school or institution of learning of his own choice

is not due process of law, and if the person is a citizen of the United States such an enactment abridges his privileges and immunities as such.

The act is not separable; it relates to but one subject and has only one purpose—to prohibit the same person, corporation or association from receiving pupils of the two races for instruction; in order to accomplish this, penalties are imposed, not only upon the offending person, association, or corporation, but also upon all persons who teach for the institution, although they may teach the two races separately, and upon all pupils who attend such schools, although the two races may be taught separately by different teachers and in different rooms. It follows that if any provision is unconstitutional, the entire act is invalid.

A party has a right to rely upon the unconstitutionality of a statute where his rights are injuriously affected by the unconstitutional provision contained in the statute; and, where the unconstitutional provision would not of itself directly affect his rights, but is so connected with the constitutional provisions which do affect them that it invalidates the entire act. *Field* v. *Clark*, 143 U. S. 649; *Pollock* v. *Farmers' Loan & Trust Co.*, 158 U. S. 601.

The rule that a part of a statute may be unconstitutional, and other parts may be valid, only applies where the parts are clearly separable and may well stand alone. This rule does not apply to cases where the enforcement of the unconstitutional parts affects the complaining party just as much as the enforcement of the constitutional parts. The constitutional part of an act will not be enforced when other parts are unconstitutional, unless the court can assume that the legislature would have passed the act if the void part had been omitted.

The difference between the extent of legislative power over schools and other institutions established and maintained by the State and its power over private schools and institutions is obvious. In the case of public schools the legislature may regulate the hours of teaching, prescribe the text-books, the

qualifications of teachers, the ages at which pupils shall be admitted, classify the students who shall be instructed together, and in fact do almost anything which does not make unjust or unconstitutional discriminations among the people who contribute by taxation to the funds used in defraying the expenses of the system. But a private school stands upon exactly the same footing as any other private business, and the power of the State to prohibit it, or to interfere with the right to teach in it, or to attend it, is no greater than its power to prohibit any other ordinary occupation of the people. The statute is unnecessary and unreasonable, and therefore an arbitrary interference with the rights of the people in the conduct of their private business and in the pursuit of their ordinary occupations. The right to maintain a private school is no more subject to legislative control than the right to conduct a store, or a farm, or any other one of the various occupations in which the people are engaged. The right of the citizen to choose and follow an innocent occupation is both a personal and a property right. *Cummings* v. *Missouri,* 4 Wall. 321; *Allgeyer* v. *Louisiana,* 165 U. S. 591; *Schnair* v. *Navarro Hotel Imp. Co.,* 182 N. Y. 83; *Butchers' Union Co.* v. *Crescent City Co.,* 111 U. S. 746; *Yick Wo* v. *Hopkins,* 118 U. S. 356; *Slaughter-House Cases,* 16 Wall. 36; *Colon* v. *Lisk,* 153 N. Y. 188; *People* v. *Gibson,* 101 N. Y. 389; *People* v. *Marx,* 99 N. Y. 377; *In re Jacobs,* 98 N. Y. 98; *Lochner* v. *State of New York,* 198 U. S. 45; *Corfield* v. *Coryell,* 4 Washington C. C. 371; *Maxwell* v. *Dow,* 176 U. S. 588, 589.

The nature or extent of legislative power cannot be affected by calling it the "police power." Absolute arbitrary power over the lives, liberties and property of the people cannot exist in this country, under any name or in any form, and it is always the duty of the courts to disregard mere names and forms in determining whether the legislature has or has not exceeded its authority. It is for the court to decide, not only whether the subject to which legislation relates is within the scope of the power attempted to be exercised, but also whether

the legislation itself is in violation of the personal or property rights of the citizen. The subject to which the legislation relates may be clearly within the scope of the police power, and yet the enactment may be so unreasonable, unnecessary or inappropriate for the accomplishment of the purpose ostensibly designed, that the courts, in the discharge of their duty to protect personal and property rights, will be bound to hold it null and void. *Ritchie* v. *People,* 155 Illinois, 98, 110; *Eden* v. *People,* 165 Illinois, 296, 318.

The Constitution makes no distinction between the different races or different classes of the people, and if a distinction is to be made, it must be done by the legislature in the exercise of the police power. All such legislation is necessarily injurious to the peace and prosperity of the people and its validity ought to be clearly established before it receives the sanction of the courts. The manufacture and sale of ardent spirits, gambling, the maintenance of nuisances, the keeping of disorderly houses, and many other vocations which are subject to regulation and control in the exercise of the police power, are in themselves injurious to the health, morals, and safety of the public; but even over these subjects the legislative authority is limited to the enactment of reasonable and necessary laws. *Lawton* v. *Steele,* 152 U. S. 133; *In re Jacobs,* 98 N. Y. 115; *Bertholf* v. *O'Reilly,* 74 N. Y. 515; *Butchers' Union* v. *Crescent City Co.,* 111 U. S. 756; *Lochner* v. *People of New York,* 198 U. S. 45, and cases cited.

While the Fourteenth Amendment may not limit the subjects upon which the police power of a State may be exercised, so long as there is no discrimination on account of race or color, yet in the exercise of that power the State cannot disregard the limitations which the Amendment imposes. *Ex parte Virginia,* 100 U. S. 339; *Bashier* v. *Connolly,* 113 U. S. 27–31.

The Thirteenth, Fourteenth and Fifteenth Amendments to the Constitution of the United States were adopted, for the protection of the colored race, and their primary purpose was

to establish absolute civil equality—that is, to place the colored race, in respect to civil rights, upon the same basis as the white race. *The Slaughter-House Cases,* 16 Wall. 36; *Strauder* v. *West Virginia,* 100 U. S. 303; *Virginia* v. *Rives,* 100 U. S. 313; *Bush* v. *Kentucky,* 107 U. S. 110.

But the effect of the Fourteenth Amendment is not only to secure equal civil rights to the colored race, but to protect the white race also in the unmolested enjoyment of all its rights of person and property.

In order to avail himself of the protection guaranteed by that Amendment, it is not necessary for a party to show that the legislation complained of makes a discrimination against the white race, as such, or against the colored race, as such. It is sufficient if it can be shown that an attempt has been made to abridge the privileges or immunities of citizens of the United States, or to deprive persons of life, liberty or property without due process of law, or to deny to any person within the jurisdiction of the State the equal protection of the law; and if the legislation attempts to do any of these things, and the complaining party is, or will be, injured by its enforcement, he has a right to contest its validity. It is well settled that the word "person" in the Amendment includes corporations as well as individuals.

Social equality between persons of the white and colored races, or between persons of the same race, cannot be enforced by legislation, nor can the voluntary association of persons of different races, or persons of the same race, be constitutionally prohibited by legislation unless it is shown to be immoral, disorderly, or for some other reason so palpably injurious to the public welfare as to justify a direct interference with the personal liberty of the citizen; and even in such a case the restriction should go no further than is absolutely necessary.

The validity of this act cannot be sustained on the ground that it was an amendment or repeal of the charter of the college. *Allgeyer* v. *Louisiana,* 165 U. S. 578, distinguished.

*Mr. N. B. Hays*, with whom *Mr. James Breathitt*, Attorney General of the State of Kentucky, *Mr. Thos. B. McGregor* and *Mr. Charles H. Morris* were on the brief, for defendant in error:

The statute is a reasonable exercise of the police power. Legislative power is the power and authority vested in the general assembly to make laws. This power, within constitutional limitations, is absolute and complete. The object and purpose of every government is to foster and promote the happiness and general welfare of its people. The welfare of the State and community is paramount to any right or privilege of the individual citizen. The rights of the citizen are guaranteed, subject to the welfare of the State. Hence, the State has not surrendered its sovereign power of legislation for the general welfare, by constitutional guaranties of individual liberty. Cooley's Const. Lim. (6th ed.), 704; *Lake View* v. *Rose Hill Cemetery Co.*, 70 Illinois, 192; Hare's American Constitutional Laws, 766; Tiedeman's Limitations of Police Power, 212; 111 U. S. 746, Justice Bradley; 165 U. S. 580, Justice Peckham; *State* v. *Holden*, 14 Utah, 718; *Commonwealth* v. *Alger*, 7 Cush. 85; *Power* v. *Pennsylvania*, 127 U. S. 678; 22 Am. and Eng. Ency. Law (2d ed.), 937.

This statute, the constitutional provision and the statutes of Kentucky providing for separate public schools for the two races; the statute prohibiting the intermarriage of the two races; the statute incapacitating the issue of such marriages from inheriting; and the statute requiring common carriers to provide separate coaches for the two races, are *in pari materia;* and the Commonwealth, in the enactment and passage of all these laws, had but one common purpose and end—to preserve race identity, the purity of blood, and prevent an amalgamation, and such is the settled public policy of the State. Kentucky Statutes, §§ 795, 2097, 2098, 2111, 2114, 4428.

Several other States, as well as Kentucky, prohibit the two races from attending the same public school, and provide separate public schools for the two races. These laws have been held to be a reasonable and valid exercise of the police

power of such States, and not to abridge any right or privilege granted by the Fourteenth Amendment to either of the races. *Lehew* v. *Brummell*, 103 Missouri, 551, 552; *Cary* v. *Carter*, 48 Indiana, 362; *Martin* v. *Board of Education*, 42 W. Va. 515; *State of Ohio* v. *McCann*, 21 Ohio St. 210; *Cisco* v. *School Board*, 161 N. Y. 598; *Bertonneau* v. *Board of Directors*, 3 Woods, 180.

The laws of several States, including Kentucky, require common carriers to provide separate cars or coaches for the white and colored persons who travel over their lines. These laws have been upheld by the Supreme Court of the United States as a reasonable and valid exercise of the police power; and not to abridge any immunity or privilege secured by the Fourteenth Amendment to either of the races. *West Chester & Philadelphia R. R. Co.* v. *Miles*, 93 Am. Dec. 747, 748.

The legislature of Kentucky is vested with a large discretion and is at liberty to act for the preservation of the public peace and general welfare. The political rights of the two races may be equal without being identical. The conditions of this statute apply equally to both races. *Mugler* v. *Kansas*, 123 U. S. 678; *L. & N. R. R. Co.* v. *Kentucky*, 161 U. S. 677.

This statute neither denies the equal protection of the law, nor does it deprive any person of life, liberty or property without due process of law. Social equality is not guaranteed by the Fourteenth Amendment, nor is voluntary association guaranteed to the races.

The State by this statute prohibits the voluntary co-education of the two races, nothing more. Unless white pupils are guaranteed the right to voluntarily associate with the pupils of the colored race, and *vice versa*, the act is not in conflict with, nor repugnant to, the Fourteenth Amendment. *Cary* v. *Carter*, 17 Am. Rep. 757.

All property in the Commonwealth and every property right is held subject to those general regulations which are necessary to promote the common good and general welfare.

The following authorities will illustrate the different phases

in which this question has been presented to the courts: Cooley's Constitutional Limitations (7th ed.), 830; *Powers* v. *Commonwealth*, 101 Kentucky, 287; *Dunn* v. *The Commonwealth*, 88 Am. Rep. 344; *N. Y., N. H. & H. R. R. Co.* v. *New York*, 165 U. S. 628; *Gladine* v. *Minnesota*, 166 U. S. 427; *Allgeyer* v. *Louisiana*, 165 U. S. 578; *Nor. Securities Co.* v. *United States*, 193 U. S. 196; *Otis* v. *Parker*, 187 U. S. 66; *Holden* v. *Hardy*, 169 U. S. 366.

The right to do business within a State may be regulated and sometimes prohibited when the contracts or business conflict with the policy of the State as contained in its statutes. *Allgeyer* v. *Louisiana*, 165 U. S. 578.

MR. JUSTICE BREWER, after making the foregoing statement, delivered the opinion of the court.

There is no dispute as to the facts. That the act does not violate the constitution of Kentucky is settled by the decision of its highest court, and the single question for our consideration is whether it conflicts with the Federal Constitution. The Court of Appeals discussed at some length the general power of the State in respect to the separation of the two races. It also ruled that "the right to teach white and negro children in a private school at the same time and place is not a property right. Besides, appellant as a corporation created by this State has no natural right to teach at all. Its right to teach is such as the State sees fit to give to it. The State may withhold it altogether, or qualify it. *Allgeyer* v. *Louisiana*, 165 U. S. 578."

Upon this we remark that when a state court decides a case upon two grounds, one Federal and the other non-Federal, this court will not disturb the judgment if the non-Federal ground, fairly construed, sustains the decision. *Murdock* v. *City of Memphis*, 20 Wall. 590, 636; *Eustis* v. *Bolles*, 150 U. S. 361; *Giles* v. *Teasley*, 193 U. S. 146, 160; *Allen* v. *Arguimbau*, 198 U. S. 149.

Again, the decision by a state court of the extent and limitation of the powers conferred by the State upon one of its own corporations is of a purely local nature. In creating a corporation a State may withhold powers which may be exercised by and cannot be denied to an individual. It is under no obligation to treat both alike. In granting corporate powers the legislature may deem that the best interests of the State would be subserved by some restriction, and the corporation may not plead that in spite of the restriction it has more or greater powers because the citizen has. "The granting of such right or privilege [the right or privilege to be a corporation] rests entirely in the discretion of the State, and, of course, when granted, may be accompanied with such conditions as its legislature may judge most befitting to its interests and policy." *Home Ins. Co.* v. *New York*, 134 U. S. 594, 600; *Perrine* v. *Chesapeake & Delaware Canal Co.*, 9 How. 172, 184; *Horn Silver Mining Co.* v. *New York*, 143 U. S. 305–312. The act of 1904 forbids "any person, corporation or association of persons to maintain or operate any college," etc. Such a statute may conflict with the Federal Constitution in denying to individuals powers which they may rightfully exercise, and yet, at the same time, be valid as to a corporation created by the State.

It may be said that the Court of Appeals sustained the validity of this section of the statute, both against individuals and corporations. It ruled that the legislation was within the power of the State, and that the State might rightfully thus restrain all individuals, corporations and associations. But it is unnecessary for us to consider anything more than the question of its validity as applied to corporations.

The statute is clearly separable and may be valid as to one class while invalid as to another. Even if it were conceded that its assertion of power over individuals cannot be sustained, still it must be upheld so far as it restrains corporations.

There is no force in the suggestion that the statute, although

clearly separable, must stand or fall as an entirety on the ground the legislature would not have enacted one part unless it could reach all. That the legislature of Kentucky desired to separate the teaching of white and colored children may be conceded, but it by no means follows that it would not have enforced the separation so far as it could do so, even though it could not make it effective under all circumstances. In other words, it is not at all unreasonable to believe that the legislature, although advised beforehand of the constitutional question, might have prohibited all organizations and corporations under its control from teaching white and colored children together, and thus made at least uniform official action. The rule of construction in questions of this nature is stated by Chief Justice Shaw in *Warren* v. *Mayor of Charlestown*, 2 Gray, 84, quoted approvingly by this court in *Allen* v. *Louisiana*, 103 U. S. 80–84.

"But if they are so mutually connected with and dependent on each other, as conditions, considerations or compensations for each other as to warrant a belief that the legislature intended them as a whole, and that if all could not be carried into effect, the legislature would not pass the residue independently, and some parts are unconstitutional, all the provisions which are thus dependent, conditional or connected, must fall with them."

See also *Loeb* v. *Township Trustees*, 179 U. S. 472, 490, in which this court said:

"As one section of a statute may be repugnant to the Constitution without rendering the whole act void, so, one provision of a section may be invalid by reason of its not conforming to the Constitution, while all the other provisions may be subject to no constitutional infirmity. One part may stand, while another will fall, unless the two are so connected or dependent on each other in subject-matter, meaning or purpose, that the good cannot remain without the bad. The point is, not whether the parts are contained in the same section, for, the distribution into sections is purely artificial; but whether

they are essentially and inseparably connected in substance—
whether the provisions are so interdependent that one cannot
operate without the other."

Further, inasmuch as the Court of Appeals considered the
act separable, and while sustaining it as an entirety gave an
independent reason which applies only to corporations, it is
obvious that it recognized the force of the suggestions we have
made. And when a state statute is so interpreted this court
should hesitate before it holds that the Supreme Court of
the State did not know what was the thought of the legisla-
ture in its enactment. *Missouri, Kansas & Texas Railway* v.
*McCann,* 174 U. S. 580, 586; *Tullis* v. *Lake Erie & Western
Railroad,* 175 U. S. 348, 353.

While the terms of the present charter are not given in the
record, yet it was admitted on the trial that the defendant
was a corporation organized and incorporated under the gen-
eral statutes of the State of Kentucky, and of course the state
courts, as well as this court on appeal, take judicial notice of
those statutes. Further, in the brief of counsel for the de-
fendant is given a history of the incorporation proceedings,
together with the charters. From that it appears that Berea
College was organized under the authority of an act for the
incorporation of voluntary associations, approved March 9,
1854 (2 Stanton Rev. Stat. Ky. 553), which act was amended
by an act of March 10, 1856 (2 Stanton, 555), and which in
terms reserved to the General Assembly "the right to alter
or repeal the charter of any associations formed under the
provisions of this act, and the act to which this act is an amend-
ment, at any time hereafter." After the constitution of 1891
was adopted by the State of Kentucky, and on June 10, 1899,
the college was reincorporated under the provisions of chap. 32,
art. 8, Ky. Stat. (Carroll's Ky. Stat. 1903, p. 459), the charter
defining its business in these words: "Its object is the educa-
tion of all persons who may attend its institution of learn-
ing at Berea, and, in the language of the original articles,
'to promote the cause of Christ.'" The constitution of 1891

provided in § 3 of the bill of rights that "Every grant of a franchise, privilege or exemption shall remain, subject to revocation, alteration or amendment." Carroll's Ky. Stat. 1903, p. 86. So that the full power of amendment was reserved to the legislature.

It is undoubtedly true that the reserved power to alter or amend is subject to some limitations, and that under the guise of an amendment a new contract may not always be enforcible upon the corporation or the stockholders; but it is settled "that a power reserved to the legislature to alter, amend or repeal a charter authorizes it to make any alteration or amendment of a charter granted subject to it, which will not defeat or substantially impair the object of the grant, or any rights vested under it, and which the legislature may deem necessary to secure either that object or any public right. *Commissioners on Inland Fisheries* v. *Holyoke Water Power Co.*, 104 Massachusetts, 446, 451; *Holyoke Co.* v. *Lyman*, 15 Wall. 500, 522;" *Close* v. *Glenwood Cemetery*, 107 U. S. 466, 476.

Construing the statute, the Court of Appeals held that "if the same school taught the different races at different times, though at the same place or at different places at the same time it would not be unlawful." Now, an amendment to the original charter, which does not destroy the power of the college to furnish education to all persons, but which simply separates them by time or place of instruction, cannot be said to "defeat or substantially impair the object of the grant." The language of the statute is not in terms an amendment, yet its effect is an amendment, and it would be resting too much on mere form to hold that a statute which in effect works a change in the terms of the charter is not to be considered as an amendment, because not so designated. The act itself, being separable, is to be read as though it in one section prohibited any person, in another section any corporation, and in a third any association of persons to do the acts named. Reading the statute as containing a separate prohibition on all corporations, at least, all state corporations,

it substantially declares that any authority given by previous charters to instruct the two races at the same time and in the same place is forbidden, and that prohibition being a departure from the terms of the original charter in this case may properly be adjudged an amendment.

Again, it is insisted that the Court of Appeals did not regard the legislation as making an amendment, because another prosecution instituted against the same corporation under the fourth section of the act, which makes it a misdemeanor to teach pupils of the two races in the same institution, even although one race is taught in one branch and another in another branch, provided the two branches are within twenty-five miles of each other, was held could not be sustained, the court saying: "This last section, we think, violates the limitations upon the police power: it is unreasonable and oppressive." But while so ruling it also held that this section could be ignored and that the remainder of the act was complete notwithstanding. Whether the reasoning of the court concerning the fourth section be satisfactory or not is immaterial, for no question of its validity is presented, and the Court of Appeals, while striking it down, sustained the balance of the act. We need concern ourselves only with the inquiry whether the first section can be upheld as coming within the power of a State over its own corporate creatures.

We are of opinion, for reasons stated, that it does come within that power, and on this ground the judgment of the Court of Appeals of Kentucky is

*Affirmed.*

MR. JUSTICE HOLMES and MR. JUSTICE MOODY concur in the judgment.

MR. JUSTICE HARLAN, dissenting.

This prosecution arises under the first section of an act of the General Assembly of Kentucky, approved March 22, 1904.

The purpose and scope of the act is clearly indicated by its title. It is "An act to prohibit white and colored persons from attending the same school." Ky. Acts 1904, p. 181.

It is well to give here the entire statute, as follows:

"SEC. 1. That it shall be unlawful for any person, corporation or association of persons to maintain or operate any college, school or. institution where persons of the white and negro races are both received as pupils for instruction; and any person or corporation who shall operate or maintain any such college, school or institution shall be fined $1,000, and any person or corporation who may be convicted of violating the provisions of this act shall be fined· $100 for each day they may operate said school, college or institution after such conviction.

"SEC. 2. That any instructor who shall teach in any school, college or institution. where members of said two races are received as pupils for instruction shall be guilty of operating and maintaining same and fined as provided in the first section hereof.

"SEC. 3. It shall be unlawful for any white person to attend. any school or institution where negroes are received as pupils or receive instruction, and it shall be unlawful for any negro or colored person to attend any school or institution where white persons are received as pupils or receive instruction. Any person so offending ·shall be fined $50 for each day he attends such institution or school: *Provided*, That the provisions of this law shall not apply to any penal institution or house of reform.

"SEC. 4. Nothing in this act shall be construed to prevent any private school, college or institution of learning from maintaining a separate and distinct branch thereof, in a different locality, not less than twenty-five miles distant, for the education exclusively of. one race .or color.

"SEC. 5. .This act shall not take effect, or be in operation before, the 15th day of July 1904." Acts 1904, ch, 85, p. 181.

· The plaintiff in error, Berea College, is an incorporation, organized under the General Laws of Kentucky in 1859. Its original articles of incorporation set forth that the object of

the founders was to establish and maintain an institution of learning, "in order to promote the cause of Christ." In 1899 new articles were adopted, which provided that the affairs of the corporation should be conducted by twenty-five persons.

In 1904 the college was charged in a Kentucky state court with having unlawfully and willfully received both white and negro persons as pupils for instruction. A demurrer to the indictment was overruled, and a trial was had which resulted in a verdict of guilty and the imposition of a fine of $1,000 on the college. The trial court refused an instruction asked by the defendant to the effect that the statute was in violation of the Fourteenth Amendment of the Constitution of the United States. A motion in arrest of judgment and for a new trial having been overruled, the case was taken to the highest court of Kentucky, where the judgment of conviction was affirmed, one of the members of the court dissenting.

The state court had before it and determined at the same time (delivering one opinion for both cases) another case against Berea College—which was an indictment based on § 4 of the same statute—under which the college was convicted of the offense of "maintaining and operating a college, school and institution of learning where persons of the white and negro races are both received, and within *a distance of twenty-five miles of each other*, as pupils for instruction." After observing that there were fundamental limitations upon the police power of the several States which could not be disregarded, the state court held § 4 of the statute to be in violation of those limitations because "unreasonable and oppressive." Treating that particular section as null and void and regarding the other sections as complete in themselves and enforcible, the state court, in the first case (the present case) based on § 1, affirmed, and in the second case based on § 4 of the statute reversed the judgment. It held it to be entirely competent for the State to adopt the policy of the separation of the races, even in private schools, and concluded its opinion in these words: "The right to teach white and negro children in a private

school at the same time and place is not a property right."
The state court (but without any discussion whatever) added,
as if merely incidental to or a make-weight in the decision of
the pivotal question, in this case, these words: "Besides, ap-
pellant as a *corporation* created by this State has no natural
right to teach at all. Its right to teach is such as the State
sees fit to give to it. The State may withhold it altogether or
qualify it. *Allgeyer* v. *Louisiana*, 165 U. S. 578." It con-
cluded: "We do not think the act is in conflict with the Fed-
eral Constitution."

Upon a review of the judgment below this court says that
the statute is "clearly separable and may be valid as to one
class, while invalid as to another;" that "even if it were con-
ceded that its assertion of power over individuals cannot be
sustained, still the statute must be upheld so far as it restrains
corporations." "It is unnecessary," this court says, "for us to
consider anything more than the question of its validity *as
applied to corporations. . . .* We need concern ourselves
only with the inquiry whether the first section can be upheld
as coming within the power of a State over its own *corporate
creatures.*" The judgment of the state court is now affirmed,
and thereby left in full force, so far as Kentucky and its
courts are concerned, although such judgment rests in part
upon the ground that the statute is not, in any particular, in
violation of any rights secured by the Federal Constitution.
In so ruling, it must necessarily have been assumed by this
court that the legislature may have regarded the teaching of
white and colored pupils at the same time and in the same
school or institution, when maintained by private individuals
and associations, as wholly different in its results from such
teaching when conducted by the same individuals acting under
the authority of or representing a corporation. But, looking
at the nature or subject of the legislation it is inconceivable that
the legislature consciously regarded the subject in that light.
It is absolutely certain that the legislature had in mind to pro-
hibit the teaching of the two races in the same private insti-

tution, at the same time by whomsoever that institution was conducted. It is a reflection upon the common sense of legislators to suppose that they might have prohibited a private *corporation* from teaching by its agents, and yet left individuals and unincorporated associations entirely at liberty, by the same instructors, to teach the two races in the same institution at the same time. It was the teaching of pupils of the two races *together*, or in the same school, no matter by whom or under whose authority, which the legislature sought to prevent. The manifest purpose was to prevent the association of white and colored persons in the same school. That such was its intention is evident from the title of the act, which, as we have seen, was "to prohibit white and colored persons from attending the same school." Even if the words in the body of the act were doubtful or obscure the title may be looked to in aid of construction. *Smythe* v. *Fiske*, 23 Wall. 374.

Undoubtedly, the general rule is that one part of a statute may be stricken down as unconstitutional and another part, distinctly separable and valid, left in force. But that general rule cannot control the decision of this case.

Referring to that rule, this court in *Huntington* v. *Worthen*, 120 U. S. 97, 102, said that if one provision of a statute be invalid the whole act will fall, where "*it is evident the legislature would not have enacted one of them without the other.*"

In *Spraigue* v. *Thompson*, 118 U. S. 90, 94, 95, the question arose as to the validity of a particular section of the Georgia Code. The Supreme Court of that State held that so much of a section of that code as made certain illegal exceptions could be disregarded, leaving the rest of the section to stand; this upon the principle that a distinct, separable and unconstitutional part of a statute may be rejected and the remainder preserved and enforced. "But," the court took care to say, "the insuperable difficulty with the application of that principle of construction to the present instance is, that by rejecting the exceptions intended by the legislature of Georgia the statute is made to enact *what confessedly the legislature never meant.*"

In *Field* v. *Clark*, 143 U. S. 649, 696, it was held that certain specified parts of the tariff act of 1890 could be adjudged invalid without affecting the validity of another and distinct part, covering a different subject. But that, as the court held, was because "they are entirely separate *in their nature*, and, in law, are wholly independent of each other."

A case very much in point here is that of *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 540, 565. Those were actions upon promissory notes, and an open account. The defense was that the notes and the account arose out of business transactions with the Union Sewer Pipe Company, an Ohio corporation doing business in Illinois, and which corporation, it was alleged, was a trust and combination of a class or kind described in the Illinois anti-trust statute. That statute made certain combinations of capital, skill or acts by two or more persons for certain defined purposes illegal in Illinois. The defense was based in part on that statute, and the question was whether the statute was repugnant to the Constitution of the United States, in that, after prescribing penalties for its violation, it provided by a distinct section (§ 9) that its provisions "shall not apply to agricultural products or live stock while in the hands of the producer or raiser." The transactions out of which the notes and account in suit arose had no connection whatever with agriculture or with the business of raising live stock, and yet the question considered and determined—and which the court did not feel at liberty to pass by—was whether the entire statute was not unconstitutional by reason of the fact that the ninth section excepted from its operation agricultural products and live stock while in the hands of the producer or raiser. This court held that section to be repugnant to the Constitution of the United States, in that it made such a discrimination in favor of agriculturists or live-stock dealers as to be a denial to all others of the equal protection of the laws. The question then arose, whether the other provisions of the statute could not be upheld and enforced by eliminating the ninth section. This court held in the negative, saying: "The

principles applicable to such a question are well settled by the adjudications of this court. If different sections of a statute are independent of each other, that which is unconstitutional may be disregarded, and valid sections may stand and be enforced. But if an obnoxious section is of such import that the other sections without it would cause results *not contemplated or desired by the legislature*, then the *entire statute must be held inoperative*. . . . Looking then at all the sections together, we must hold that the legislature would not have entered upon or continued the policy indicated by the statute unless agriculturists and live-stock dealers were excluded from its operation and thereby protected from prosecution. The result is that the statute must be regarded as an entirety, and in that view it must be adjudged to be unconstitutional as denying the equal protection of the laws to those within its jurisdiction who are not embraced by the ninth section."

The general principle was well stated by Chief Justice Shaw, who, after observing that if certain parts of a statute are wholly independent of each other, one part may be held void and the other enforced, said in *Warren* v. *Mayor and Aldermen of Charlestown*, 2 Gray, 84: "But if they are so mutually connected with and dependent on each other, as conditions, *considerations* or compensations for each other as to warrant a belief that the *legislature intended them as a whole*, and that if all could not be carried into effect, the legislature would not pass the residue independently, and some parts are unconstitutional, all the provisions which are thus dependent, conditional or *connected*, must fall with them." This statement of the principle was affirmed in *Allen* v. *Louisiana*, 103 U. S. 80, 84, and again in *Loeb* v. *Columbia Township Trustees*, 179 U. S. 472, 490, cited by the court. In the latter case the court said: "One part [of a statute] may stand, while another will fall, unless the two are so connected or dependent on each other in subject matter, meaning or purpose, that the good cannot remain without the bad. The point is, not whether the parts are contained in the same section, for, the distribution into sec-

tions is purely artificial; but whether they are essentially and inseparably *connected in substance*—whether the provisions are so interdependent that one cannot *operate without the other."* All the cases are, without exception, in the same direction.

Now, can it for a moment be doubted that the legislature intended all the sections of the statute in question to be looked at, and that the purpose was to forbid the teaching of pupils of the two races together in the same institution, at the same time, *whether the teachers represented natural persons or corporations?* Can it be said that the legislature would have prohibited such teaching by corporations, and yet consciously permitted the teaching by private individuals or unincorporated associations? Are we to attribute such folly to legislators? Who can say that the legislature would have enacted one provision without the other? If not, then, in determining the intent of the legislature, the provisions of the statute relating to the teaching of the two races together by *corporations* cannot be separated in its operation from those in the same section that forbid such teaching by individuals and unincorporated associations. Therefore the court cannot, as I think, properly forbear to consider the validity of the provisions that refer to teachers who do not represent corporations. If those provisions constitute as, in my judgment, they do, an essential part of the legislative scheme or policy, and are invalid, then, under the authorities cited, the whole act must fall. The provision as to corporations may be valid, and yet the other clauses may be so inseparably connected with that provision and the policy underlying it, that the validity of all the clauses necessary to effectuate the legislative intent must be considered. There is no magic in the fact of incorporation which will so transform the act of teaching the two races in the same school at the same time that such teaching can be deemed lawful when conducted by private individuals, but unlawful when conducted by the representatives of corporations.

There is another line of thought. The state court evidently regarded it as necessary to consider the entire act; for it ad-

judged it to be competent for the State to forbid *all* teaching of the two races together, in the same institution, at the same time, no matter by whom the teaching was done. The reference at the close of its opinion, in the words above quoted, to the fact that the defendant was a corporation, which could be controlled, as the State saw fit, was, as already suggested, only incidental to the main question determined by the court as to the extent to which the State could control the teaching of the two races in the same institution. The state court upheld the authority of the State, under its general police power, to forbid the association of the two races in the same institution of learning, although it adjudged that there were limitations upon the exercise of that power, and that, under those limitations, § 4 was *invalid*, because unreasonable and oppressive. If it had regarded the authority of the State over its own corporations as being, in itself, and without reference to any other view, sufficient to sustain the statute, so far as the defendant corporation is concerned, it need only have said that much, and omitted all consideration of the general power of the State to forbid the teaching of the two races together, by anybody, in the same institution at the same time. It need not, in that view, have made any reference whatever to the twenty-five mile provision in the fourth section as being "unreasonable and oppressive," whether applied to teaching by individuals or by corporations, or held such provision to be void on that special ground.

Some stress is laid upon the fact that when Berea College was incorporated the State reserved the power to alter, amend or repeal its charter. If the State had, in terms, and in virtue of the power reserved, *repealed* outright the charter of the college, the case might present a different question. But the charter was not repealed. The corporation was left in existence. The statute here in question does not purport to *amend* the charter of any particular corporation, but assumes to establish a certain rule applicable alike to all individuals, associations or corporations that assume to teach the white and black races

together in the same institution.  Besides, it should not be assumed that the State intended, under the guise of impliedly amending the charter of a private corporation, to destroy, or that it could destroy, the substantial, essential purposes for which the corporation was created, and yet leave the corporation in existence.  The authorities cited by this court, in its opinion, establish the proposition that under the reserved power to amend or alter a charter no amendment or alteration can·be made which will "defeat or substantially impair the object of the grant."  *Holyoke* v. *Lyman,* 15 Wall. 500; *Close* v. *Glenwood Cemetery,* 107 U. S. 466, 476.

In my judgment the court should directly meet and decide the broad question presented by the statute.  It should adjudge whether the statute, as a whole, is or is not unconstitutional, in that it makes it a crime against the State to maintain or operate a private institution of learning where white and black pupils are received, at the same time, for instruction.  In the view which I have as to my duty I feel obliged to express my opinion as to the validity of the act as a whole.  I am of opinion that in its essential parts the statute is an arbitrary invasion of the rights of liberty and property guaranteed by the Fourteenth Amendment against hostile state action and is, therefore, void.

The capacity to impart instruction to others is given by the Almighty for beneficent purposes and its use may not be forbidden or interfered with by Government—certainly not, unless such instruction is, in its nature, harmful to the public morals or imperils the public safety.  The right to impart instruction, harmless in itself or beneficial to those who receive it, is a substantial right of property—especially, where the services are rendered for compensation.  But even if such right be not strictly a property right, it is, beyond question, part of one's liberty as guaranteed against hostile state action by the Constitution of the United States.  This court has more than once said that the liberty guaranteed by the Fourteenth Amendment embraces "the right of the citizen to be free in the en-

joyment of all his faculties," and "to be free to use them in all lawful ways." *Allgeyer* v. *Louisiana*, 165 U. S. 578; *Adair* v. *United States*, 208 U. S. 161, 173. If pupils, of whatever race—certainly, if they be citizens—choose with the consent of their parents or voluntarily to sit together in a private institution of learning while receiving instruction which is not in its nature harmful or dangerous to the public, no government, whether Federal or state, can legally forbid their coming together, or being together temporarily, for such an innocent purpose. If the Commonwealth of Kentucky can make it a crime to teach white and colored children together at the same time, in a private institution of learning, it is difficult to perceive why it may not forbid the assembling of white and colored children in the same Sabbath-school, for the purpose of being instructed in the Word of God, although such teaching may be done under the authority of the church to which the school is attached as well as with the consent of the parents of the children. So, if the state court be right, white and colored children may even be forbidden to sit together in a house of worship or at a communion table in the same Christian church. In the cases supposed there would be the same association of white and colored persons as would occur when pupils of the two races sit together in a private institution of learning for the purpose of receiving instruction in purely secular matters. Will it be said that the cases supposed and the case here in hand are different in that no government, in this country, can lay unholy hands on the religious faith of the people? The answer to this suggestion is that in the eye of the law the right to enjoy one's religious belief, unmolested by any human power, is no more sacred nor more fully or distinctly recognized than is the right to impart and receive instruction not harmful to the public. The denial of either right would be an infringement of the liberty inherent in the freedom secured by the fundamental law. Again, if the views of the highest court of Kentucky be sound, that commonwealth may, without infringing the Constitution of the United States, forbid the

association in the same private school of pupils of the Anglo-Saxon and Latin races respectively, or pupils of the Christian and Jewish faiths, respectively. Have we become so inoculated with prejudice of race that an American government, professedly based on the principles of freedom, and charged with the protection of all citizens alike, can make distinctions between such citizens in the matter of their voluntary meeting for innocent purposes simply because of their respective races? Further, if the lower court be right, then a State may make it a crime for white and colored persons to frequent the same market places at the same time, or appear in an assemblage of citizens convened to consider questions of a public or political nature in which all citizens, without regard to race, are equally interested. Many other illustrations might be given to show the mischievous, not to say cruel, character of the statute in question and how inconsistent such legislation is with the great principle of the equality of citizens before the law.

Of course what I have said has no reference to regulations prescribed for public schools, established at the pleasure of the State and maintained at the public expense. No such question is here presented and it need not be now discussed. My observations have reference to the case before the court and only to the provision of the statute making it a crime for any person to impart harmless instruction to white and colored pupils together, at the same time, in the same private institution of learning. That provision is in my opinion made an essential element in the policy of the statute, and if regard be had to the object and purpose of this legislation it cannot be treated as separable nor intended to be separated from the provisions relating to corporations. The whole statute should therefore be held void: otherwise, it will be taken as the law of Kentucky, to be enforced by its courts, that the teaching of white and black pupils, at the same time, even in a *private* institution, is a crime against that Commonwealth, punishable by fine and imprisonment.

In my opinion the judgment should be reversed upon the ground that the statute is in violation of the Constitution of the United States.

MR. JUSTICE DAY also dissents.