75 So.2d 832 (1954)
The BOARD OF PUBLIC INSTRUCTION OF MANATEE COUNTY, Florida, for and on Behalf of Special Tax School District Number One of Manatee County, Appellant,
v.
The STATE of Florida, and Others, Appellees.
Supreme Court of Florida, en Banc.
November 16, 1954.
*833 Daniel & Woodward, Thomas W. Stewart, Bradenton, Weldon G. Starry, Tallahassee, and Caldwell, Marshall, Trimble & Mitchell, New York City, for appellant.
Mabry, Reaves, Carlton, Fields & Ward, Tampa, for appellees.
TERRELL, Justice.
Appellant proffered its petition in the Circuit Court of Manatee County to validate school bonds. Answers and a motion to dismiss were filed by the State of Florida and other intervenors, challenging the validity of and the manner of compliance with Chapter 29260, Acts of 1953, insofar as it required a special registration of freeholders prerequisite to the issuance of said bonds and as to requirement for calling the election by the County Commissioners. The answers and motion to dismiss also challenged the qualification of an indeterminate number of participating electors.
Testimony was taken before the Court who entered a final decree holding that Chapter 29260 was exclusive, under the terms of which only the Board of County Commissioners of Manatee County had power to call an election for the purpose of submitting to the qualified electors the proposition of issuing the proposed bonds. The Court further found that the resolution of the Board of County Commissioners of December 7, 1953, approving, ratifying and confirming the action of the Board of Public Instruction in calling said election does not amount to a legal call by the Board of County Commissioners, that the Board of Public Instruction did not have power to call said election under Chapter 236, Florida Statutes 1951, F.S.A., and that said election was improperly called. The motion to dismiss the petition was granted and validation refused. This appeal is from that decree.
The point for determination is whether or not the special bond election was legally called and held.
It is a fact that Chapter 29260, Special Acts of 1953, requires that elections to approve the issuance of bonds by special tax districts be called by the Board of County *834 Commissioners but it is also true that certain provisions of Chapter 236, particularly Sections 236.36 and 236.37, and others, provide that special tax school district bond elections be called by the Board of Public Instruction. The resolution of the Board of Public Instruction of Manatee County calling the election involved in this case shows on its face that it was called November 3, 1953, pursuant to Section 236.37, Florida Statutes, for the purpose of issuing, acquiring, building, enlarging, furnishing or otherwise improving buildings or school grounds or for any other exclusive use of public free schools within the school district.
Said resolution also shows that pursuant to Section 230.34, Florida Statutes 1941, as amended by Chapter 23726, Acts of 1947, F.S.A., all school districts in Manatee County including other territory in the county, was as of January 1, 1948 consolidated into one school district known as Special Tax School District Number One, the boundaries of which are coextensive with the boundaries of the county. The resolution further shows that prerequisite to the issuance of said bonds the required surveys were made and a school building program formulated that the proposed school building program was essential to afford adequate school facilities for the county, that the County Superintendent of Public Instruction made a complete study of the survey, as did representatives of the State Department of Education, and recommended improvements for each white and colored school in the county. All of which, including every other prerequisite for the proposed bond issue, was unanimously approved by the Board of Public Instruction of the county and submitted to the State Superintendent of Public Instruction who on November 20, 1953 approved as required by law.
The record further discloses that on December 2, 1953 the Board of Public Instruction of Manatee County adopted a resolution ordering the holding of an election in Special Tax School District Number One, Manatee County, on the question of issuing the proposed bonds and for re-registration of the qualified electors who are freeholders, as provided by Chapter 29260, Acts of 1953. Said resolution designated the places for voting, time for holding the election, the purpose for which it was held, form of the ballot, and gave the required notice of the election and re-registration including the resolution, in fact every essential requirement of the law with reference to advertising such elections, registration of electors, the amount and distribution of the bonds, was followed.
On January 27, 1954 the Board of Public Instruction again met in regular session and adopted a resolution wherein it recited the fact of calling and holding said election, the question that was voted on and the duty of the Board of Public Instruction to canvass the returns and declare the results thereof. The resolution further declared that the Board of Public Instruction "has made and completed said canvass of said election returns, and has determined that the result thereof shows that 3820 votes were cast in said election, that 2186 votes were cast in favor of the issuance of said bonds and that 1634 votes were cast against the issuance of said bonds, and that the total vote for and against the issuance of said bonds constitutes a majority of the qualified electors who are registered as freeholders of said county as of the date of said election and qualified to vote therein."
On February 1, 1954, five days after the Board of Public Instruction met and canvassed the returns of said election, the Board of County Commissioners of Manatee County met and recognized the call of the said elections, the purpose for which it was called and that it was its duty to canvass the returns and declare the result thereof. The Board of County Commissioners then proceeded to canvass the returns with the identical results and findings as those announced in the preceding paragraph by the Board of Public Instruction. On December 7, 1953 in regular session the Board of County Commissioners of Manatee County adopted a resolution wherein it concurred with the Board of Public Instruction in calling the election to approve the issuance of said bonds and resolved that *835 the "action of the Board of Public Instruction of the County of Manatee, Florida, in calling said special election in Special Tax School District No. One of the County of Manatee, Florida, on the question of the issuance of $1,750,000.00 school bonds of said district, as provided in the resolution adopted by said Board of Public Instruction on the 2nd day of December 1953, be and the same is hereby in all respects approved, ratified and confirmed."
In adopting the latter resolution and the one for canvassing the returns of said bond election the Board of County Commissioners was evidently proceeding on the theory that since Chapter 29260 required them to call the election, the approval of the action of the Board of Public Instruction in calling it would be equivalent to a call by the Board of County Commissioners. They may have been correct, their resolution certainly approved in every respect the action of the Board of Public Instruction with reference to calling and holding said bond election. As a matter of law we do not think we are required to decide this point since in our opinion the Board of Public Instruction was authorized under Section 236.37, Florida Statutes, F.S.A., to issue said bonds and that in calling the election to approve their issuance and in all other respects the requirements of said statute were complied with.
Chapter 29260 did not deal with anything but the qualification and re-registration of electors to vote in special tax school district bond elections in Manatee County. True, a provision was thrown into the body of the act requiring the County Commissioners to call such elections on resolution of the Board of Public Instruction. As to validity of this and other phases of said act we express no opinion, the chancellor refused to do so and we find no occasion for doing so. Both the Board of Public Instruction and the Board of County Commissioners canvassed the election returns and found that the "total vote for and against the issuance of said bonds constitutes a majority of the qualified electors who are registered as freeholders of said county as of the date of said election and qualified to vote therein." Since a majority of the qualified freeholder electors went to the polls and voted and no qualified elector freeholder is here complaining, and other requirements of the law are shown to have been met, we think said bond election was legally called and held.
Appellees urge several additional questions relative to the reasonableness of Chapter 29260, as to requirements for re-registration, whether Article 12, Section 17 or Article 9, Section 6 of the Florida Constitution, F.S.A., control, whether the electors were expected to take the oath required by Section 3, Article 6, Florida Constitution, when they re-registered, but the Court disposed of the case on the question above explored, expressly overruled all other grounds of the motion to dismiss and no cross-assignments were noted or brought here so we decline to rule on any of them.
Since the appeal was perfected a motion to dismiss was lodged in this Court predicated on the suggestion that the validity of said bonds is now moot because they were approved for the purpose of building and equipping white and Negro schools but subsequent to their approval the Supreme Court of the United States in Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 688, hereinafter referred to as the Brown case, has abolished segregation in the public schools and being so it will now be necessary for the Board of Public Instruction to revise its school construction program to meet the requirements of a non-segregated school system.
The gist of the holding in the Brown case was that the doctrine of "separate but equal" has no place in the field of public education and that segregation of children in the public schools solely on the basis of race, even though the physical facilities and other tangible factors may be equal, deprives those of the minority group of equal opportunities in contravention of the equal protection clause of the Fourteenth Amendment. The Court realized the gravity *836 of that holding and because of its "wide applicability", the "great variety of local conditions" and the complexity of the problems presented in formulating decrees in the cases, the Court restored them to the docket and requested further argument by the Attorney General of the United States and the attorneys general of the affected states by October 1, 1954 in order that it have the advantage of their assistance in formulating proper decrees to finally dispose of the questions.
From this holding it follows that the main reason for restoring the cases to the docket and calling for argument was to determine what sort of a decree should be entered with reference to the time and conditions under which segregation should be effectuated. In this determination many more problems are implicit than appear on the surface. A Mosaic recently published by a leading periodical (U.S. News and World Report) reveals an extensive study of the segregation question and among other things points out that four states approve segregation in the public schools by local option, eleven states have no specific laws on segregation, sixteen states prohibit segregation in the public schools and seventeen states, including the District of Columbia, enforce public school segregation.
The states in the first, second and third groups, thirty-one in all, should experience little difficulty adjusting their school program to the Court's order. The latter seventeen states including the District of Columbia will feel the impact of the Court's decision in the Brown case very materially. These states are all in the southeastern part of the country, extending from Delaware to Texas, south of the Ohio River and north to Missouri. From its inception the public school system and the system of higher education in these states has been planned and projected on the segregation pattern. Religious educational institutions, hospitals and churches for the two races have been constructed and administered on a like plan. Many millions of dollars have gone into the construction and equipment of plants and preparation of teachers and administrators to staff these institutions. The bulk of the funds to provide and support them was contributed in taxes and donations by local people. While the doctrine of "separate but equal" is said not to have been attained in all respects, it has always been the objective; it was approved in Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256, which was a transportation case but it has been several times considered in cases involving educational questions. Berea College v. Commonwealth of Kentucky, 211 U.S. 45, 29 S.Ct. 33, 53 L.Ed. 81. It has been relied on for many years and was not rejected until the opinion in the Brown case was handed down.
There is another facet which renders the problem of shifting from segregated to non-segregated schools difficult. In states where large numbers of both white and Negro citizens have settled, the pattern of settlement has generally followed segregation lines, the mixed settlement being the exception. Public schools have been established to accommodate this pattern of settlement. White schools were set up convenient to white populations and Negro schools convenient to Negro populations. In other words, there was a voluntary zoning which made school district zoning by the Board of Public Instruction easy. To effectuate non-segregation in states where the school system has been set up from its inception on a segregation plan would in many instances render present physical plants useless and in other instances would require the expenditure of many millions of dollars for enlargement or the construction of new facilities to provide an adequate public school system. Centralization and the school bus have virtually erased the "little red school house" or rural school from the picture but geography and the racial aspect have controlled the location of the school plant. In the states of Kentucky and Oklahoma the difficulty pointed out in this paragraph would be softened because of the wide margin between white and Negro school population, the latter being little above six percent of the whole in these two states.
*837 "Separate but equal" school facilities has so long been the law and practice in Florida and the other states where segregation is the vogue that it is a fixed philosophy, it is not the product of prejudice nor is it a reflex from the will to discriminate. The people are committed to it for what they were led to believe were sound reasons, it is one of their fundamental beliefs, fortified by generations of practice and legislative policy and repeatedly approved by state courts of last resort. It has also been approved for many years by the Supreme Court of the United States and only recently rejected by it. The recent finding of the Court that segregation of white and Negro children in the public schools has a detrimental effect on the Negro children, certainly had no part in formulating what may be termed a sectional view of the matter.
In setting the case for argument in October we must assume from the tone of the Supreme Court's order that it is in search of assistance on which to predicate a wise and proper decree. The foregoing and many other considerations may be submitted for consideration at that time. Every state will have peculiar barriers to overcome. It is only from consideration of these and other factors that the Court will be able to determine whether non-segregation should begin at the graduate school level, the college level, the high school or the elementary school level or at all levels. The Brown case comprehends all levels.
School systems are developed on long range planning. Since the Brown case reverses a trend that has been followed for generations certainly there should be a gradual adjustment from the existing segregated system to the non-segregated system. This is the more true in most of the states with segregated school systems because plants and physical facilities have not kept pace with the growth of population, hence they are bursting at the seams from overcrowded conditions.
Reversing social, political or educational trends is difficult business, absent a public demand for them. It is not questioned that the states with segregated school systems have made distinct educational progress, none of them have asked for or desire a change, and only three of them are parties to this litigation. None of these states advocated the changed policy and some of them are said to be antagonistic to it. Local school committees and other organizations have taken a firm stand against it. The other three categories of states will have barriers to overcome but they should not be so difficult. The real purpose of the October argument is to evolve a blueprint for the execution of non-segregation, in other words to cast an order to effectuate the Court's decree. Enough has been said to alert any one who thinks the problem through, to the difficulties that will be encountered in doing this. It is a safe prediction that they are more numerous, more serious and more delicate than any with which the Court has grappled for a long time.
The purpose of this line of discussion is to reveal the lack of merit in the motion to dismiss based on the decision in the Brown case. Exploration of the intangible barriers to desegregation make a stronger case against the motion. They are more compelling than the physical ones. The moral attitude of the white population in the affected states will have infinitely more to do with correcting the alleged vices of segregation than any court decision. At least one-fourth of the population of the country is involved, and it is utter folly to contend that desegregation or any other new and untried philosophy will take root and grow before a sympathetic feeling for it is established. Intangible barriers dissolve under sympathetic understanding and trained leadership much more readily than they do under court orders.
It is of course true that since the decision in the Brown case the doctrine of "separate but equal" has no place in the field of public education. If that is to be the law from here on out it does not erase the fact that this doctrine, so recently discarded, has been the educational policy of seventeen states since the beginning of their *838 public school system and that the legislatures of these states have proceeded on that line to establish and strengthen their school systems. To replace it with an antithetic doctrine will take years of skilful nurture in a soil that must be made congenial to the change. The ratio of Negro to white population makes the way to change difficult. In the nation the ratio of Negroes to whites is 1 to 10. If this ratio was evenly distributed the proposition of integration would be much less complex but in most of the affected states the ratio is 18 to 82, in some 35 to 65, and in others 45 to 55 or thereabout. Such ratios make the problem more complex.
Differences in population ratios coupled with a background of master-servant relationship, the hatreds engendered by reconstruction, inadequate school systems for the Negroes with the tensions produced from these and other pressures, have resulted in cultural and economic differences that will not be abridged by social or legal fiats. As one eminent educational psychologist put it, the nation's elementary schools are pursuing a curriculum "prefabricated to fit a theoretical statistical average that in actual practice fits only about 40 percent." The result, says he, is that rigid instruction schedules move too fast for about 30 percent of the students and too slowly for the other 30 percent. What the common denominator will be if non-segregation is precipitated, no one can tell but certainly the reduction in classroom standards would be embarrassing if not chaotic to both races. The point to the whole matter is that you cannot enforce a philosophy or a system of instruction on a people so long inured to freedom of thought and conduct in the field involved so long as they are fundamentally opposed to that which is enforced on them.
On Christian ethical grounds some critics contend that there is no sound reason to controvert the doctrine of the Brown case but it is not amiss to point out that long before that decision the states with segregated schools were moving to correct the alleged inequalities and injustices of segregation. Many Catholic, Protestant and private institutions of learning had thrown open their doors to Negroes. The Methodists, Baptists and Presbyterians have institutionally gone on record as approving the decision in the Brown case. Negroes have been admitted to a number of southern tax-supported colleges and professional schools including the law, medical and scientific associations. They have been elected to city councils and school boards, they have been designated as law enforcement officers in many instances and in fact in most scientific ventures all color distinctions have been abolished. During the decade prior to the Brown decision the affected states spent more millions to equalize bi-racial school systems than had been previously spent in their history. In the south a liberal attitude has been exercised in a number of cases where the question of admitting Negroes to institutions of higher learning has been proposed. The fact that integration has been accomplished in the armed forces, account of military discipline and other factors, can have little if any influence on the case at hand.
In law I think the Brown decision was a great mistake. Whether or not the doctrine of "separate but equal" has a place in the field of public education is a question of policy determinable by the legislature. It is not a judicial question as I understand the canons of interpretation. Likewise, the question of segregation is for the same reason a legislative rather than a judicial question. As heretofore pointed out, the states so practicing it have voluntarily made great strides in removing the injustices and inequalities of segregation. After all, when these are removed there will be nothing left to quarrel about. The effect of the Brown decision will retard rather than accelerate the removal of these inequalities. It will in my judgment inject other stresses that will complicate removal, some of which have been enumerated, all of which it would not be possible to list.
In the Brown case the Court was confronted with four cases, one from Kansas, one from South Carolina, one from Virginia *839 and one from Delaware. The plaintiffs in each case were seeking admission to public schools on a non-segregated basis. The Court held that "separate educational facilities are inherently unequal." What order of enforcement will emerge from the hearing in October will be determined by the showing made but it is inconceivable that the Court will undertake to settle the question of segregation in Florida, Georgia, Alabama, Mississippi and other states that were not parties to the Brown case, each of which has its peculiar problems with reference to the matter. It is further inconceivable that in dealing with the question the Court will impose a condition on these states that Congress or any of the respective state legislatures have deigned to impose on them, that none of them have asked for or want, that they are in violent opposition to and have deep and decided convictions against. That it was a legislative question that the states could deal with as they saw fit has been bred in the bone so long that it sticks out in the blood.
Another historical consideration fortifies this contention. When the Civil Rights Act was written into the Constitution in 1868 as the Fourteenth Amendment, Mr. Wilson of Iowa, its sponsor, removed it from any implication of mixed schools in these words: "Do they mean that in all things civil, social, political, all citizens, without distinction of race or color, shall be equal? By no means can they be so construed * * * nor do they mean that * * * their children shall attend the same schools. These are not civil rights or immunities." The Civil Rights Act was incorporated into the Fourteenth Amendment during reconstruction and its approval by the South was required before their representatives could be seated in Congress. Despite the fact that a majority of southern representatives were Negroes and "carpet baggers," the question of integrated or non-segregated schools was not broached. In other words, enemies of the traditional South, those who dominated and were exploiting it, ordained that white and colored persons shall not be taught in the same but in separate schools. Two parallel societies were thus established in the South to work out their salvation in their own way. These two societies have worked in harmony to do this and the proof is ample that great progress has been made. Attempts at hasty amalgamation of these societies will produce more stresses, troubles and conflicts than the good it can do will compensate for.
From these and other observations that might be catalogued, we are convinced that the end of segregation must come by gradual adjustment. Practical approach to the realities can lead to no other conclusion. How long it will require no one can predict. Because of residential segregation there will always be schools predominantly white and those predominantly colored. It will be much more difficult at the public school level than it will at the graduate school, the professional school or the university level. To homogenize Topsy, Little Red Riding Hood and Mary who carried her little lamb to school is going to be slow and tedious. There are still parents of children of tender years who are sensitive to any innovation or influence that, to them, militates against the cultural well-being of their offspring. It will be a tragedy to attempt to enforce it. If there is anything settled under our democratic theory it is this  that it is a mistake to impose a law on any large segment of the people before they are ready for it or ask for it. When segregation comes in the democratic way it will be under regulations imposed by local authority who will be fair and just to both races in view of the lights before them. If it comes in any other way it will follow the fate of national prohibition and some other "noble experiments". If there is anything settled in our democratic theory, it is that there must be a popular yearning for laws that invade settled concepts before they will be enforced. The U.S. Supreme Court has recognized this.
We therefore conclude that there is no merit to the motion to dismiss. Any reasonable pattern for desegregation that may be imposed will require a long time and *840 the record discloses a pressing necessity for improved school facilities. It is accordingly denied and the decree appealed from is reversed with directions to enter a decree validating the bonds.
Reversed.
ROBERTS, C.J., HOBSON and DREW, JJ., and MURPHREE, Associate Justice, concur.
THOMAS, J., agrees to the conclusion.
MATHEWS, J., dissents.
MURPHREE, Associate Justice (concurring).
I agree with Justice TERRELL that the ruling of the lower court should be reversed and the motion to dismiss the appeal denied. I would deny the motion to dismiss, however, upon the additional ground proposed by appellant; that is, that the people of Manatee County have recognized the need and indicated their desire for additional school facilities, and the Board of Public Instruction has the inherent power to reallocate the use of such facilities whenever it shall become necessary to comply with legal requirements. Surely a building in which the races are to be mixed will be constructed no differently than one to be occupied by the white or by the colored. Under non-segregation it may be that the location of a particular school might be different, but that would not be sufficient reason to stifle indefinitely the public school capital improvement program now in progress throughout the state, in view of the seriously over-crowded conditions in practically every county.
ROBERTS, C.J., and TERRELL, HOBSON and DREW, JJ., concur.
MATHEWS, Justice (dissenting).
This appeal results from a final decree in a bond validation proceeding whereby the Circuit Judge refused to validate the bonds in question on procedural grounds. The legality of the purpose or use of the proceeds of the bonds was not questioned. This appeal is from that decree.
After the bond validation in the Circuit Court and prior to the submission of the matter to this Court, by reason of an opinion by the Supreme Court of the United States in the case of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, the purpose or use of the proceeds of the bond issue as set forth in the proceedings became violative of the Fourteenth Amendment to the Constitution of the United States.
The appellees filed a motion to dismiss the appeal with the suggestion that the validation of the bonds is now a moot question.
I cannot agree with my associates in ordering the Circuit Judge to validate a bond issue when it is shown that the proceeds are to be used for a purpose prohibited by the State Constitution and in violation of the contractual obligations with the freeholders brought into being by the freeholders' election approving the bonds.
The question presented must now be answered by consideration of the Constitutions, statutes and unquestioned legal principles with reference to the bonds of governmental subdivisions. The opinions, conclusions, theories and wishful thinking of experts in psychology, philosophy, biology and sociology are of no assistance in determining these questions.
A summary of unquestioned principles of law concerning such bonds and the validation thereof will be helpful.
It is illegal for a county, municipality, district or other political subdivision to issue bonds for an unauthorized purpose or use.
Even if bonds are authorized to be issued by a political subdivision by legislative authority, they are illegal if the purpose or use for which they are to be issued, or for which the proceeds are to be used, is prohibited by the State or Federal Constitutions.
*841 Public money cannot be spent unless pursuant to law and even then cannot be spent if the purpose or use for which it is to be spent is prohibited by the State or Federal Constitutions. Section 4, Article IX, Florida Constitution.
As an example: even though the Legislature enacted a law authorizing a tax for the benefit of a chartered company or for paying interest on bonds issued by any such company, the tax could not be levied or bonds issued because the use or purpose of same would be in direct violation of Section 7, Article IX, Florida Constitution.
Another example; even though the Legislature authorized the county, city or district to issue bonds for the benefit of any individual, company or corporation or association, such bonds would be illegal and void because they would be in direct violation of Section 10, Article IX, Florida Constitution.
The very purpose of a bond validation proceeding is to determine the legality of the use or purpose of the proceeds for which it is proposed to issue the bonds. When the resolution and proceedings submitted to the freeholders designates the particular purpose for which the proceeds are to be used and such purpose is illegal or is not authorized or is prohibited by the State or Federal Constitutions, the bonds are illegal and void even though approved by the freeholders.
If the purpose named and specified in the resolution or proceedings is legal then the bonds should be validated and if the administrative board or other authorities should attempt to violate the contractual obligations with the freeholders and use the proceeds for a purpose different from that named and specified in the resolution or other proceedings then such action may be enjoined. In such a case the illegal use of the proceeds would not appear until there was an attempt or a threat to change the purpose.
Where prior to validation it appears that the purpose or use of the proceeds of the bonds is illegal or not authorized or violates the State or Federal Constitutions, such questions should be determined and settled in the bond validation proceedings and not by injunction, after the bonds have been validated and it appears that the proceeds are to be used for an illegal purpose.
Section 12, Article XII, of the State Constitution, reads:
"White and colored children shall not be taught in the same school, but impartial provision shall be made for both."
This was a part of the resolution when proposed and voted upon by the freeholders and is still a part of the Constitution of the State of Florida, but it is in direct conflict with the Fourteenth Amendment to the Constitution of the United States as now construed by the Supreme Court of the United States in Brown v. Board of Education, supra, in which the Supreme Court of the United States declared:
"We conclude that in the field of public education the doctrine of `separate but equal' has no place. Separate educational facilities are inherently unequal. Therefore, we hold that the plaintiffs and others similarly situated for whom the actions have been brought are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment. * * *
"* * * We have now announced that such segregation is a denial of the equal protection of the laws." (Emphasis supplied.)
Although this appears to be an ordinary proceeding to validate school bonds which is provided for by Chapter 75, F.S.A., the effect of the opinion of the Supreme Court of the United States in the Brown case may determine the validity of the bonds.
The contention is that the purpose and use of the proceeds of the bonds as approved by the freeholders is in conflict with the Fourteenth Amendment to the Constitution of the United States, as now construed, *842 and, therefore, the bonds are illegal and void, and if now changed to comply with the Fourteenth Amendment of the United States Constitution, will be illegal and void because they would then be issued for a use or purpose in violation of the contractual obligations with the freeholders and in direct conflict with Section 12, Article XII, State Constitution.
It is now urged that since the bonds were authorized and since the vote of the freeholders on said bonds, the decision of the Supreme Court of the United States in the Brown case has made the question of the validation or issuance or sale of said bonds moot.
The issuance of school bonds is provided for in Chapters 230 and 236, F.S., F.S.A. After the preliminaries have been taken, Section 236.37, F.S., F.S.A., provides that the county boards shall determine whether projects for which bonds are proposed to be issued are essential, and after this determination is made the county board shall adopt a resolution "setting forth the proposals with reference to the projects" and this is sent to the State Superintendent. When the State Superintendent approves the same, "the county board shall then proceed at its next ensuing meeting to adopt a resolution authorizing" an election to be held for the purpose of determining whether bonds shall be issued "as proposed". Subsequent sections require publication of the resolution, notice of election, conducting of election and canvassing returns. If the result of the election is that a majority of votes cast shall be for bonds, the board is authorized and required to issue the bonds authorized by said election for the "purpose specified" in the resolution as published. It will, therefore, be observed that the law under which it is proposed to issue the bonds requires with great particularity that the freeholders be given notice of the election and the purposes specified for the issuance of bonds.
The bonds proposed to be issued were covered by resolution for "White Schools" and "Negro Schools". The resolution reads as follows:
"Be It Resolved by the Board of Public Instruction of Manatee County, Florida:
"Section 1. An election is hereby ordered to be held in Special Tax School District No. 1 of Manatee County, Florida on 26th day of January, 1954, to determine whether or not there shall be issued bonds of said District in the principal amount of not exceeding $1,750,000 bearing interest, payable semi-annually, at such rate or rates, not exceeding the legal rate, as shall be determined at the time of the sale thereof, and to mature serially in annual installments over a period not to exceed twenty years from the date of said bonds, for the purpose of financing part of the cost of acquiring, building, enlarging, furnishing or otherwise improving buildings or school grounds, more specifically described as follows:

 "White Schools
 [Then follows details of improvements and
 amounts.]
 "Negro Schools
 [Then follows details of improvements and
 amounts.]
 "Grand Total $3,250,000.00
 "Funds estimated as available
 under constitutional
 amendment $1,500,000.00
 _____________
 "Balance  amount of
 proposed bond issue $1,750,000.00

as provided in a resolution heretofore adopted by this Board on the 3rd day of November, 1953, which said resolution was approved pursuant to law by the State Superintendent of Public Instruction on the 20th day of November, 1953."
At the time of the election by the freeholders, the bonds in question were authorized for the purposes designated; that is, for the purpose of "acquiring, building, enlarging, furnishing or otherwise improving buildings or school grounds" for separate Negro and white schools.
*843 In due course petition for validation of said bonds was filed and after hearing, final decree refusing to validate such bonds on grounds not here involved was made and entered on April 24, 1954.
Chapter 75, F.S.A. provides for bond validations. The only purpose of this law is to determine the validity of the proposed bonds before they are offered for sale and the proceeds used for the purposes designated in the proposal upon which the freeholders voted.
It is suggested that a decision or opinion concerning the validity of the bonds, because of the Fourteenth Amendment of the United States Constitution as now construed and Article XII of the Florida Constitution, is premature and should not be decided until after the bonds have been sold and there is some action or threat to use the proceeds of the bonds.
It would do no good "to lock the stable door after the horse is gone". It would not protect the taxpayer after bonds are issued and sold and an aluminum factory was built to hold that such bonds were illegal. State v. Town of North Miami, Fla., 59 So.2d 779. In a study of the validation proceedings which have been appealed to this Court since the enactment of the validation statutes it appears that such proceedings were for one purpose and one only and that was to determine the validity or legality of the proposed bond issues prior to the sale of the bonds. The determination of the legality of the bonds in the validation proceedings vitally and materially affects the marketability of the bonds.
It is quite true that if the purpose for which the bonds were voted upon is legal and the bonds have been sold, an injunction may be a proper remedy to prevent an administrative board from spending the money for a purpose different from that as set forth in the bond resolution and voted upon by the freeholders. In the case of Whitner v. Woodruff, 68 Fla. 465, 67 So. 110, after the bonds were sold, the board of county commissioners attempted to change a proposed road to a new location from that submitted to the voters. This Court said:
"From this language we understand the holding to be that the county commissioners may change the proposed route within a municipality after a different location has been submitted to popular vote as the one to be paved. To this we cannot give our assent. While the citizens might, if requested, have such confidence in their officials as to give them power in general terms, yet, when the request is for specific limited power, those officials must keep within its limitations. If the county commissioners obtain the consent of the people by a vote to pave, at public expense, a designated road or street, those owning property fronting upon that road or street may justly complain, if the officials undertake to pave, not that street, but another parallel street three blocks distant."
In the case now before us the purpose for which the bonds were approved was legal at the time of the election. After the filing of the validation proceedings the purpose set forth in the bond resolution upon which the people voted has now been made illegal because in violation of the Fourteenth Amendment to the Constitution of the United States as now construed.
Our present Constitution is known as the Constitution of 1885, which provides for a uniform system of free public schools and for the liberal maintenance of the same. Among the provisions provided for as a part of the free public school system was Section 12, Article XII, which reads:
"White and colored children shall not be taught in the same school, but impartial provision shall be made for both."
At the time of the adoption of the State Constitution of 1885 no one had raised the question now before us.
In the case of Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256, in a transportation case, the Supreme Court of *844 the United States adopted the doctrine of "separate but equal" facilities.
In the case of Brown v. Board of Education, supra, it was contended that "separate but equal" facilities deprive the Negro children of equal protection of the laws guaranteed to them by the Fourteenth Amendment to the Constitution of the United States. It was further contended that even though the physical facilities were identical in every respect they were unequal because they were separate.
Acting under Article XII of the State Constitution, the Legislature of Florida has been most generous in attempting to maintain a uniform system of free public schools and to make impartial provision for Negro and white children.
In 1885 there were few, if any, public supported Negro schools. The state was in bad financial condition, but it undertook to provide a system which would bring into existence schools for Negro children on the same basis as white children.
Until Section 9 of Article XII was amended at the general election in 1926, the amount contributed by the state for the school system was very limited and consisted only of the interest of the state school fund, the one-mill state ad valorem tax, and fines collected under the penal laws of the state and county. This section was amended in 1926 to include all appropriations by the Legislature which with all other county funds to be apportioned by law solely for the purpose of support and maintenance of the free public schools (as provided for in Article XII of the Constitution). In 1927 the total amount appropriated by the state for the public school system was approximately one-half million dollars, and under this amendment the last appropriation made by the Legislature exceeded fifty million dollars for the maintenance and support of the schools, which was in addition to funds raised by local taxation and also by Section 18 of Article XII, for capital outlay and for the erection of school buildings as a part of the free public school system as established under our Constitution. In an attempt to provide separate and equal facilities and to give to Negro children the full advantage of the opportunity of a free public education, the state, counties and districts have spent untold millions of dollars. In addition to this the state has established a university exclusively for Negroes where they are afforded an opportunity for the same advantages in higher education as is afforded to white students.
Under the decision in the Brown case these school plants and buildings cannot now be used as separate but equal facilities for the two races, but all buildings and all school plants must now be open to all in direct contravention of our Constitution if they are supported and maintained at public expense.
If the buildings and plants now in existence cannot be used as a part of the free public school system providing for separate but equal facilities for Negro and white children, then it naturally follows that no school or school plant in the future can be so used.
There is no reason why we should dodge this question or why it should only be discussed behind closed doors or in whispers. It is a public question involving the Constitutions of the State and the United States, and is now presented to this Court openly, frankly and above-board. Notwithstanding the fact that we may know, which we do, that the Fourteenth Amendment of the Constitution of the United States was never adopted in the manner required by that fundamental document, United States v. Gugel, D.C., 119 F. Supp. 897, it is now a part of that document simply because the Supreme Court of the United States has said so; and what that Court says is a part of the fundamental law of the land, and we are bound by it. In Henderson v. State ex rel. Lee, Fla., 65 So.2d 22, 25, the suit arose in Wisconsin about a Wisconsin law. Florida was not a party to the suit. There is a material difference between a decree in a particular suit and an opinion by *845 the Supreme Court of the United States. In the Henderson case, this Court said:
"The question of the agreement of this Court with the majority opinion in the Wisconsin case [Amalgamated Association of Street Electric Railway and Motor Coach Employees of America, Division 998 v. Wisconsin Employment Relations Board, 340 U.S. 383, 71 S.Ct. 359, 95 L.Ed. 364] is not involved in this opinion. Article 6 of the Constitution of the United States, among other things, provides as follows:
"`This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; * * * shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'
"When a law, enacted by Congress, is construed and interpreted by the Supreme Court of the United States, that interpretation and construction becomes a part of the supreme law of the land, and an opinion by that tribunal upon the questions at issue is absolutely binding upon this Court, whatever may be the personal predilections of the Justices.
* * * * * *
"* * * So it is, that until the law is modified or changed by Congress, or the opinion with reference thereto is modified, changed or receded from by the Supreme Court of the United States, this Court and every other court, is bound to give full effect to the law as construed in the opinion, for it is the supreme law of the Land."
It matters not what our views may be with reference to the Brown case, until it is modified or changed or the Fourteenth Amendment to the Constitution of the United States is amended, it is binding upon us. Obedience to constituted authority is essential in our form of government.
In order to reach a correct decision upon the question now before us it is necessary that we analyze to some extent the opinion in Brown v. Board of Education, supra.
It should be noted that even in that case, Brown v. Board of Education, supra, the Supreme Court of the United States has not yet gone so far as to pre-empt the field of free public education. It still recognizes that free public education is primarily a state function and that it cannot force any state to furnish free public education. This opinion goes no farther than to say that where the state itself undertakes to provide a system of free public education then it must provide it on the terms prescribed by that opinion: that is, the system adopted by the state must make the free public education available to all on equal terms as prescribed by it. It then lays down the proposition that even though physical facilities and other tangible factors may be equal, the children of minority groups are denied equal educational opportunities unless the same identical facility is afforded to every group. The opinion further holds that the doctrine that "separate but equal" has no place in free public education and denies to children of minority groups the equal protection of the laws guaranteed by the Fourteenth Amendment. In the course of its opinion in Brown v. Board of Education, supra, the Supreme Court of the United States said:
"Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that *846 any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.
"We come then to the question presented: Does segregation of children in public schools solely on the basis of race, even though the physical facilities and other `tangible' factors may be equal, deprive the children of the minority group of equal educational opportunities? We believe that it does.
"In Sweatt v. Painter, supra (339 U.S. 629, 70 S.Ct. [848] 850, [94 L.Ed. 1114]), in finding that a segregated law school for Negroes could not provide them equal educational opportunities, this Court relied in large part on `those qualities which are incapable of objective measurement but which make for greatness in a law school.' In McLaurin v. Oklahoma State Regents, supra (339 U.S. 637, 70 S.Ct. [851] 853, [94 L.Ed. 1149]), the Court, in requiring that a Negro admitted to a white graduate school be treated like all other students, again resorted to intangible considerations: `* * * his ability to study, to engage in discussions and exchange views with other students, and, in general, to learn his profession.' Such considerations apply with added force to children in grade and high schools. To separate them from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone. * * *
"Whatever may have been the extent of psychological knowledge at the time of Plessy v. Ferguson, this finding is amply supported by modern authority. Any language in Plessy v. Ferguson contrary to this finding is rejected.
"We conclude that in the field of public education the doctrine of `separate but equal' has no place. Separate educational facilities are inherently unequal. Therefore, we hold that the plaintiffs and others similarly situated for whom the actions have been brought are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment. This disposition makes unnecessary any discussion whether such segregation also violates the Due Process Clause of the Fourteenth Amendment." (Emphasis supplied.)
The actual effect of this opinion is that if a state builds two school plants side by side, identical in every detail, equal protection of the laws is nevertheless denied if Negroes are required to attend one school plant and white children are required to attend the other.
The Court lays great stress upon its own pronouncement that the policy of separating races is usually interpretive of denoting an inferiority complex and states that segregation has a tendency to retard the educational and mental development of Negro children.
The Negro race has made more progress under segregation in a shorter time than any other race in history. They have been afforded an opportunity to develop their own culture in schools attended only by those of their own race. In these schools they have had the opportunity and have taken advantage of it. The opinion of the Supreme Court of the United States in the Brown case takes absolutely no account of the effect of desegregation upon white children and seems to express the opinion that only colored children will be affected. Nothing could possibly produce a feeling of inferiority in the Negro child more than to require of him that he go to a school largely attended by white children where he would have practically no opportunity to associate with children of his own race.
It is well that the Supreme Court of the United States has recognized that education is perhaps the most important function of state and local governments. A school *847 plant of today is entirely different from the school of yesterday where "Mary" carried her little lamb or where "Little Red Riding Hood" attended. A school plant today consists of buildings where teaching takes place and where many and varied social functions are held. Such plants contain cafeterias, dining rooms, toilet facilities, recreation rooms; and the grounds going to make up the plant contain ample space for football fields, basketball courts, tennis courts, walks, swimming pools and other recreational centers. The effect of this opinion constitutes not only an attempt to force white and Negro children to attend the same classrooms together but also that Negro children are denied the equal protection of the law unless white children are forced to co-mingle freely with them, "`to engage in discussions and exchange of views with other students'" (white), and to enjoy "intangible considerations". Sitting in the same classroom, or seat, is only one step for complete desegregation.
It is urged upon us that because the Supreme Court of the United States in the cases now before it has requested the parties to present further argument as to how particular decrees shall be framed and how they shall be made effective, the free public school system of the State of Florida is not yet affected. This is an incorrect assumption. The Supreme Court of the United States announced, in its opinion, in no uncertain terms that the plaintiffs were deprived of equal protection of the laws because "separate but equal" has no place, that separate educational facilities are inherently unequal and that segregation has deprived the plaintiffs of the equal protection of the laws. Although recognizing that it has no authority to order a state to maintain a free public school system, it has stated that "where the state has undertaken to provide it, [it] is a right which must be made available to all on equal terms", and that equal means the same facilities. After having made these solemn announcements, the Supreme Court of the United States concluded by saying: "We have now announced that such segregation is a denial of the equal protection of the laws." (Emphasis supplied.) It did not say that the opinion would become effective next year, five years or ten years from now, but now; that is, the date of the filing of its opinion. By its opinion the Court ruled that segregation in the free public schools is a denial of equal protection of the law although the facilities may be identical. Consequently, such opinion is now the supreme law of the land by which we are bound, irrespective of what our personal views may be.
The opinion not only reverses the position heretofore taken by the Supreme Court of the United States, but being the supreme law of the land, it has utterly destroyed Article XII of the Constitution of the State of Florida which provides for free public education for Negro and white children, with impartial provision for both, but prohibits the teaching of Negroes and whites in the same school plant. In addition to this constitutional prohibition, Section 228.09, F.S., F.S.A., is as follows:
"228.09 Separate schools for white and negro children required
"The schools for white children and the schools for negro children shall be conducted separately. No individual, body of individuals, corporation, or association shall conduct within this state any school of any grade (public, private, or parochial) wherein white persons and negroes are instructed or boarded in the same building or taught in the same classes or at the same time by the same teachers."
Pursuant to the Florida Constitution and in obedience thereto, Chapter 232, F.S., F.S.A., provides for compulsory attendance of children, and for the enforcement of such compulsory attendance. The compulsory attendance law was enacted to compel the attendance at free public schools as they existed under Section 12, Article XII of the State Constitution; that is to say, free public schools which were lawful at that time, but which have become unlawful under the decision in the Brown case.
*848 Free public education is still a state function, even under the opinion of the Supreme Court of the United States in the Brown case. We have no law in this state to compel attendance of Negro children at white schools or white children at Negro schools. Our compulsory attendance law now appears to be in direct conflict with the opinion of the Supreme Court of the United States in the Brown case.
The question we are confronted with, therefore, is whether or not bonds which have been authorized by a resolution of the Board of Public Instruction and approved by the freeholders as provided for by the Constitution (State) can now be validated and sold and the proceeds used for a purpose prohibited by the Constitution of the State of Florida, and in violation of the contractual obligations of the bond holders?
It is begging the question and postponing the evil day to say that the Supreme Court opinion in the Brown case is not now effective because no decree has yet been entered. The Constitution of the United States provides for the Supreme Court, and its opinions and decisions are a part of the supreme law of the land. Irrespective of the date the Supreme Court of the United States may make its decree effective, its decision, or opinion, was effective on the day it was announced. There is no need to postpone the evil day. If we must have desegregated schools and if we cannot use money voted for segregated schools for the purpose of building desegregated schools, we should know it now. There is nothing more firmly established in this state than the principle that public money cannot be spent except in pursuance of appropriations made by law, Section 4, Article IX, State Constitution, unless it be the principle that public money cannot be spent for a purpose prohibited by law. In this case both principles are involved. Not only is it true that there is no authority in the Florida Constitution or the laws of Florida which authorizes the expenditure of public money for desegregated schools, but Section 12, Article XII, Florida Constitution, is a direct, plain, positive and unequivocal prohibition against any such expenditure.
The Constitution of the State of Florida was proposed in a Convention and approved and adopted by the people. It declared the public policy of the State of Florida with reference to free public education. That policy cannot be changed except in the method provided for in the State Constitution. It is the responsibility of the Legislature and the people to establish the public policy with reference to our free public school system; it is not within the province of this Court to do so. We are bound to support, protect and defend two Constitutions and each is supreme in its sphere. The opinion in the Brown case holds that the Court cannot compel a state to maintain a system of free public education, but that if the state does undertake to do so, the system cannot be maintained on a segregated basis. The Constitution of Florida provides for a free public system of education on a segregated basis and actually prohibits the expenditure of public money or the maintenance of a desegregated system when it declared, "White and colored children shall not be taught in the same school, but impartial provision shall be made for both." (Emphasis supplied.) Section 12, Article XII, State Constitution.
If the people of the State of Florida wish to maintain a free public school system where white and Negro children will co-mingle and be taught in the same school plant, it will be necessary for a constitutional amendment to be adopted as provided for in the Constitution itself making provision for such a free public school system.
Four members of this Court cannot amend the Constitution; neither can the County School Boards, the State Board of Education, the Governor nor his Cabinet. Such amendment must be approved and proposed by three-fifths of the membership of each house of the Legislature and then voted upon and approved by the electors of the State.
The proposed bond issue as submitted to the freeholders was for the purpose of building and improving separate schools for *849 Negro and white children and, as has been noted, is in direct conflict with the United States Constitution, as now construed by the Supreme Court of the United States in the Brown case. Therefore, the purpose for which the money is to be expended is illegal. The purpose being illegal, it follows that the bonds are illegal. The purpose for which such bonds were to be issued cannot now be changed to build and improve schools where Negro and white children may be permitted or forced to attend the same schools. Such purpose would be in direct conflict with the Constitution of the State of Florida and in violation of the contractual obligations with the freeholders.
The State of Florida now has a choice. The free public school system, as fixed and established in the Constitution of Florida, has been destroyed by the opinion of the Supreme Court of the United States in the Brown case. However, even under that opinion, Florida still has the right to establish another public school system  a system in compliance with the provisions of the United States Constitution as currently construed by the Supreme Court of the United States. Whether the people of Florida will take such step involves a question of public policy over which this Court has no control. A new policy, establishing a free public school system, is for the Legislature to propose and the electorate to adopt or reject. The electorate has the right to decide that the new policy with reference to free public schools shall be to force Negro and white children to attend the same schools, in the same buildings and in the same classrooms. Under our constitutional system of government, only the electorate can make this decision.
The validation of the bonds involved now presents a moot question, and the case should be dismissed.